393 P.2d 391

THIOKOL CHEMICAL CORPORATION, a corporation, et al., Plaintiff-Respondent, Plaintiff-Intervenor and Cross-Appellants,

v.

LeGrand PETERSON, Treasurer of Box Elder County, Defendant-Appellant.

No. 9912.

Supreme Court of Utah.

June 19, 1964.

356

A. Pratt Kesler, Atty. Gen., Ronald N. Boyce, Deputy Atty. Gen., Salt Lake City, O. Dee Lund, Box Elder County Atty., Brigham City, for appellant.

Walter G. Mann, Brigham City, for respondent Thiokol.

Louis F. Oberdorfer, Lee A. Jackson, I. Henry Kutz, William Massar, Washington, D. C., and William T. Thurman and Walker E. Anderson, Salt Lake City, for respondent and intervenor United States.

CROCKETT, Justice.

Thiokol Chemical Corporation sued to recover certain taxes paid to Box Elder County under protest. The United States intervened as plaintiff because under its cost-plus contract with Thiokol it must reimburse the latter for all costs, including taxes, paid. The Utah Attorney General was served pursuant to Section 78–33–11, U.C.A.1953, because the validity of the statute is involved.

The plaintiff Thiokol Chemical Corporation (its Wasatch Division) plant in Box Elder County has, since 1957, been engaged in the research and development of the first stage of the Minute Man Missile under a cost-plus contract with the United States. For the year 1961, Box Elder County made an assessment in the aggregate amount of $244,958.80 against Thiokol with respect to certain properties it possessed and used in that County in the project referred to. Of this amount $125,801.29 was assessed on property which the contract recited title remained in the United States. It is the tax on property of this class which is the subject of this suit. The trial court found that the statute was constitutional, but held that it had been applied in a discriminatory manner, and ordered a refund. Defendant appeals.

The taxes in question were imposed under the Utah Privilege Tax Statute (Section 59–13–73, U.C.A.1953) the pertinent portion of which is:

"From and after the effective date of this act there is imposed and there shall be collected *a tax upon the possession or other beneficial use* enjoyed by any private individual, association, or corporation of any property, real or personal, which for any reason is exempt from taxation, *when such property is used in connection with a business conducted for profit,* * * *."

The grounds of attack upon this tax are that

1) The incidence of the tax falls upon the United States;

2) Thiokol had no taxable interest in the property taxed;

3) The statute is unconstitutional because (a) it is discriminatory and (b) because it was discriminatorily applied.

Thiokol contends that it is an agent selling its services to the United States Government, and as an instrumentality thereof is immune from taxation by virtue of clause 2, Article VI, of the United States Constitution, commonly called the "supremacy clause" as interpreted in a line of decisions beginning with M'Culloch v. Maryland,[1] which states the doctrine that the state cannot impose a tax upon the United States or its agencies.

1. 4 Wheat. 316, 4 L.Ed. 579 (1819).

**358**

■ The test which has been applied in ascertaining whether a tax offends against this federal immunity has been referred to as the "legal incidence" test.[2] It is stated that if the tax is directly upon the United States or an agency thereof, it is invalid.[3] But the converse is also true: If the tax falls upon another, the fact that the tax might indirectly fall upon the United States does not render it invalid. It could hardly be otherwise. The U. S. Government must obtain many goods and services from private citizens. With respect to many, perhaps all, the charge made to the Government necessarily includes the supplier's cost of doing business, including his taxes. The fact that the Government, in paying the price charged for the goods or services, thus ultimately bears the burden of the supplier's taxes, does not mean that the tax is upon the Government within the sense proscribed by the doctrine of M'Culloch v. Maryland.

■■ It is evident that the 1959 Legislature, by the enactment of Section 59–13–73, intended to close any gaps in the tax laws by imposing a tax on any property possessed or used in connection with a business for profit which was otherwise exempt from taxation. It closely resembles the Michigan statute of similar purpose, which was recently held constitutional in a series of U. S. Supreme Court cases.[4] They are grounded on the proposition that a private contractor's right to use property in a business for profit may be made subject to a nondiscriminatory tax based on its value, even though title to the property may be in the United States; and that the burden of the tax may ultimately fall on it.[5] Accordingly, Thiokol's contention that it is an agency of the United States Government, as opposed to being an independent contractor as asserted by the County, becomes of critical importance here.

■ The line of demarcation between one who operates as an independent contractor as opposed to one who is the servant or agent of another is sometimes a bit blurred. This court has on a number of occasions confronted this problem and set

2. See, e. g., Offutt Housing Co. v. Sarpy County, 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151 (1956); James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937); United States v. Boyd, 211 Tenn. 139, 363 S.W.2d 193 (1962); 84 S.Ct. 1518.

3. If the tax becomes delinquent it does not become a lien on the exempt property. See Sec. 59–13–75 and 76 U.C.A.1953.

4. See United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); United States v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958); City of Detroit, v. Murray Corp. of America, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958). See Note, The Supreme Court, 1957 Term, 72 Harv.Law Rev. 77, 157–161 (1958).

5. That economic burden of the tax falling upon the U. S. does not offend the implied constitutional immunity from state taxation, see Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941); United States v. Boyd, 84 S.Ct. 1518, decided June 15, 1964

forth various criteria to be considered in making the proper classification.[6] The most fundamental one relates to the extent of control by the one who hires over the one who performs the service. If the employer's will is represented only by a desired result, the indication is of an independent contractor; whereas, if the employer exercises control over the means of accomplishing the result, this points toward an agent or servant relationship.[7]

█ The contract with which we are concerned is written in broad terms. The import of its provisions is to require of Thiokol to produce the end results, and it does not specify in detail how the research and development shall be conducted. There is nothing to suggest that the Government presumes to enter into such problems, nor into the policy making or the management of plaintiff's operation of this military production plant. Consistent with the conclusion that it was the understanding of the parties that Thiokol was looked to only for the end result is the testimony of the Air Force Contract Administrator:

"Q. And did the contract specify exactly how that research and development would be conducted?

"A. No, sir, these contracts are in very broad terms.

"Q. Specifying the end that was desired, rather than the means by which the end would be achieved?

"A. That is correct, sir."

The above conclusion is not changed by the fact that under the contract the Government maintains a staff of about 60 people to supervise such things as security, safety measures, labor relations, accounting, procurement and the Company's organizational structure, including wages and salaries. These measures are quite understandable because of the desirability of safeguarding the interests of the Government in the expenditure of such large sums of Government money; and more importantly, because of the necessity for maximum security in this field vital to the national defense. But they are not inconsistent with the main purport of the contract which is directioned toward requiring Thiokol to pursue its own course in accomplishing "the end result," rather than the Government having actual management and direction of the enterprise.

Fitting into that same general character, is the provision of the contract with respect to the property in question. Even though it recites that the Government retains title, it appears to be intended that Thiokol will deal with it practically as it chooses. It has

---

6. See, e. g., Christean v. Ind. Comm., 113 Utah 451, 196 P.2d 502 (1948) and authorities therein cited.

7. See 2 C.J.S. Agency § 2, p. 1027.

the right to inspect and reject any property found unsuitable to its uses. Upon acceptance it has the duty to maintain, but no liability for loss, damage or the using it up entirely. Thiokol is given the right to possession and to use it *primarily* in conjunction with the contract. This seems to imply that it could use the property for other purposes if it so desires. The foregoing leads us to agree with the conclusion of the trial court that under the facts shown and the terms of the contract, Thiokol is not properly regarded as an instrumentality of the United States Government, but as an independent contractor.

In contending that Thiokol is not subject to this tax, plaintiffs rely on United States v. Livingston.[8] It was there held that South Carolina could not impose a sale and use tax upon the DuPont Corporation's use of U. S. Government property in rendering services to the Government. But there are facts which distinguish that case from ours. An important one is that DuPont undertook that project as a public responsibility, rather than to make a profit. It was paid a merely nominal fee of $1.00. Instead of the contract being in very broad terms as to result, as here, it was quite specific as to what was to be done, and the contract indicated that DuPont would act as agent or "alter ego" for the Atomic Energy Commission a Government Agency. Here, the contract contains no such provision. While we do not desire to disparage Thiokol's motives in rendering this important Government service, the fact that it used the property in a business for profit is not to be gainsaid. For the tax year involved, 1961, the profit to Thiokol was in excess of four million dollars. In addition to this substantial profit, Thiokol also benefits in carrying on this project by having the opportunity of maintaining a position of industrial leadership in the competitive field of producing and manufacturing missiles and their components and propellants.

The plaintiffs' claims as to discrimination are grounded upon the contention that Sec. 59–13–73, U.C.A.1953 imposing this tax, considered in connection with Sec. 59–2–2, results in taxing property in the possession of private individuals owned by the Federal Government, but does not tax property similarly held, but owned by the state of Utah. It is true that the latter section states that property of the state of Utah is exempt from tax, but where it has been purchased by a private individual, allows a tax on the basis of the purchaser's equity therein. The important fact to keep in mind is that the latter section, 59–2–2, exempting state-owned property, has existed since the first revised statutes of our state (Sec. 2502, R.S.U.1898). Whereas Sec. 59–13–73 came into being as Chapter 5, First Special Session Laws of Utah 1959, under the title "An Act Providing for the Imposition of a Priv-

8. 179 F.Supp. 9 (E.D.S.C.1959), aff'd. per curiam 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960).

ilege Tax Upon Possessors and Users of Tax-Exempt Property." It states: " * * there is imposed * * * a tax upon the possession * * * of any property * * which for *any reason is exempt* from taxation, when such property is used in connection with a business conducted for profit * * *."

■■ It will be noted that in this attempt to close gaps in the tax structure by placing a tax upon the privilege of possessing and using in a business for profit any property which is otherwise exempt, no exception whatsoever is made. Sec. 59–13–73, being a later enactment, takes precedence over the prior existing Sec. 59–2–2 insofar as they are plainly inconsistent.[9] It clearly and unequivocally applies the use tax *to all property exempt for any reason.* This includes property theretofore exempt by Sec. 59–2–2 if that property is used in a business for profit. If so applied, as it should be, the statute is in no way discriminatory, but uniformly taxes the privilege of using all property within its classification, whether it belongs to the United States, the the state of Utah, or any other tax-exempt entity. The fact that in some instances it has not been properly so administered, does not alter its effect, nor does it change the fact that it should be so applied.

■ We recognize the principle that a statute which, when properly applied would be fair and consistent in application, may nevertheless be applied in such a discriminatory manner as to violate constitutional guarantees of equal protection of the law and nondiscrimination, in which case relief should be granted to one aggrieved by such discriminatory application.[10] However, before this result is reached, it must be shown that there is an intentional and systematic violation of those constitutional principles, or some designed effort to violate them, to the injury of the complainant.[11] But there is no basis upon which such a conclusion could fairly be drawn here.

■ In the first place, Sec. 59–13–73 was a new statute which had been in effect for only one tax year prior to the year 1961, with which we are concerned. So the county assessor had not had much time to become sufficiently advised of the effect of this statute and to put it into full operation. It is understandable that due to the inconsistency between the wording of this new statute and the old Sec. 59–2–2, which expressly exempted state-owned property, the assessor proceeded to apply the new statute to exempt property where it was clearly applicable, such as that owned by the Federal Government, and continued to exempt state-

9. See Bateman v. Board of Examiners, 7 Utah 2d 221, 322 P.2d 381.

10. See Note, 75 Harv.L.Rev. 1374 (1962).

11. See Sunday Lake Iron Co. v. Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154; see Delaware, Lackawanna & West. R. R. v. Kinsley, 189 F.Supp. 39 (D.C.1960).

owned property as had been done under Sec. 59–2–2 since statehood, at least until there was a legal opinion or a court adjudication on the matter. The fact that the assessor followed this course, even though it is shown that there were properties in the County belonging to the State which were left exempt under that section, does not demonstrate a disposition to intentionally or designedly discriminate against this taxpayer. On the other hand, it is evident that whatever failure of proper and uniform application of the statute there was, stemmed from lack of knowledge and/or misunderstanding of the effect of this new law.

A merely mistaken or inadvertent failure to properly apply the law, even if it results in discrimination, does not provide a basis for recovery by a taxpayer because of violation of his constitutional guarantees.[12] It would be a doctrine hazardous indeed to the taxing process and to the maintenance of government to rule that if the assessor has made mistakes in taxing others, a complaining taxpayer could escape taxation. The result would be that the law could not be applied to anyone until it was correctly applied to all. It requires very little imagination to see that this would extend, not curtail, noncompliance with the law. Even though it may be difficult or impossible to achieve completely, the desideratum, of course, is that there be uniformity and equality in taxation, and that is the objective to be constantly pursued. However, the fact that this ideal is not reached should not be permitted to discourage attempts of taxing officials to bring it about, nor to defeat the legislative purpose. Where some taxpayers are not being taxed in accordance with the law, the proper way to rectify the situation is by proceeding toward uniform and proper application and not by extending the erroneous application to others.

We have failed to find in this record any justification for concluding that Sec. 59–13–73 was intentionally misapplied in such manner as to be discriminatory against Thiokol; or even that there was any "studied indifference" to its right to uniform treatment, which resulted in discrimination that would provide a basis for relief from the tax imposed by that statute.

Other arguments advanced are deemed to be without merit. The trial court's holding that the statute is constitutional is affirmed. But the holding that it was applied in such a discriminatory manner as to require refund of the tax is reversed. Remanded with directions to enter judgment for the defendant. No costs awarded. (All emphasis added.)

HENRIOD, C. J., and McDONOUGH, CALLISTER and WADE, JJ., concur.

---

12. In Iowa-Des Moines Nat'l. Bank v. Bennett, 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265 (1931), cited by plaintiffs, the facts are different and it does not support their contention of discrimination here.