INTERWEST AVIATION, Executive Air Services, Thompson Beechcraft, Intermountain Piper, Inc., Plaintiffs,

v.

COUNTY BOARD OF EQUALIZATION OF SALT LAKE COUNTY, State of Utah, Defendant.

No. 20797.

Supreme Court of Utah.

Sept. 30, 1987.

Robert W. Brandt, Robert G. Gilchrist, Salt Lake City, for plaintiffs.

Theodore Cannon, Bill Thomas Peters, Salt Lake City, for defendant.

STEWART, Associate Chief Justice:

The plaintiffs, operators of concessions located at the Salt Lake International Airport, ask us to review a decision of the Utah State Tax Commission which held that improvements built on city-owned land by the plaintiffs were subject to an *ad valorem* property tax for the tax year 1982 pursuant to Utah Code Ann. § 59–1–1 (1974). The plaintiffs claim that the improvements were owned by Salt Lake City and, therefore, were tax-exempt. We affirm.

## I.

During the tax year in question, Salt Lake City owned all the land located at the Salt Lake International Airport. Each of the plaintiffs leased property at the airport for the purpose of conducting for-profit aviation businesses. The terms and conditions of the leases were essentially standardized. The leases required the plaintiffs to provide certain services for general aviation aircraft users, including tie-down and hangar storage, a dealership, for the sale of new and used aircraft, flight training services, and ramp services, the sale of aviation fuel and lubricating oil, and sufficient certified maintenance personnel to accommodate reasonable general aviation needs. The leases also allowed the plaintiffs to provide other limited services for profit, including operating and selling aerial surveys, photographs, and maps; repairing and selling aircraft radios, instruments, and parts; operating schools for flying, navigation, mechanics, photography, aerial surveys, aircraft design and any art, science, craft, or skill pertaining thereto; operating charter and charter air taxi services; providing aircraft rental; and maintaining and cleaning aircraft interiors and exteriors.

In addition, the leases required the plaintiffs to expend a specified minimum amount of money constructing buildings on the leased premises without cost to the city and with their own construction plans. During the lease term, they had the right to the full use of, and profit from, the improvements. They paid no rent for the improvements and were allowed to depreciate the cost of the improvements over the life of the lease term. The plaintiffs also maintained the improvements at their own expense, provided and maintained all necessary insurance coverage, and received credit against ground rent for building investments. The leases also provided that title to the improvements vested in the city at the end of the lease terms.

For the first time, in 1982, Salt Lake County assessed a property tax against the plaintiffs' improvements. The plaintiffs objected and appealed to the State Tax Commission. At an informal hearing, the Tax Commission ruled that the improvements were owned by the plaintiffs and

therefore were subject to an *ad valorem* property tax under § 59-1-1. After a formal hearing, the Tax Commission affirmed its prior decision.

## II.

The plaintiffs contend that the Commission erred. They first argue that they are exempt from taxation pursuant to Utah Code Ann. § 59-13-73 (1986), which imposes a tax in lieu of a property tax and then provides for certain exemptions from that tax. That provision states in part:

> There is imposed and there shall be collected a tax upon the possession or other beneficial use enjoyed by any private individual, association, or corporation of any property, real or personal, which for any reason is exempt from taxation, when such property is used in connection with a business conducted for profit, except where the use is by way of a concession in or relative to the use of a public airport, park, fairground, or similar property which is available as a matter of right to the use of the general public, or where the possessor or user is a religious, educational or charitable organization or the proceeds of such use or possession inure to the benefit of such religious, educational or charitable organization and not to the benefit of any other individual association or corporation....

Taxes were originally assessed against the plaintiffs' properties under § 59-13-73, but the Tax Commission affirmed the assessments under the statutory provision imposing a general property tax, § 59-1-1. The plaintiffs now argue, as they did before the Tax Commission, that as concessionaires at a public airport, they are entitled to the exemption provided in § 59-13-73.

To fall within the ambit of the exemption provided by § 59-13-73, three statutory criteria must be satisfied. First, the property in question must be of the type that ordinarily is exempt from taxation. Second, the property must be used by a private individual, association, or corporation in connection with a for-profit business. Third, the business entity must be a concessionaire at one of the listed public facilities. What the statute is really aimed at, at least as far as concessionaires are concerned, is the exemption of concessionaires using city-owned property from paying taxes on that property to the extent they are in "possession" or have other "beneficial use" of it.

We assume for the purposes of this case that the plaintiffs are concessionaires at a public airport and operate for-profit businesses and, therefore, meet two of the above criteria. However, they fail to meet the first requirement for the exemption. As discussed below, the properties for which exemptions are sought are not exempt because the plaintiffs, and not Salt Lake City, own the structures in question.

## III.

The plaintiffs contend that because the city exercises substantial control over the improvements and because title to the improvements vests in the city at the termination of the leases, legal title to the improvements under the law of fixtures is in the city and the improvements are therefore exempt from taxation. The county counters that by the terms of the leases, the plaintiffs retain legal ownership of the improvements and, pursuant to § 59-1-1, taxes can be assessed against them.

Section 59-1-1,[1] promulgated pursuant to Article XIII, § 2 of the Utah Constitution,[2] imposes a tax on all tangible property

---

1. In 1982, § 59-1-1 read as follows:
 All tangible property in this state, not exempt under the laws of the United States or under the Constitution of this state, shall be taxed in proportion to its value as hereinafter provided. Intangible property shall be exempt from ad valorem assessment, levy and taxation, but nothing in this title contained shall be construed to prevent the inclusion of income from property, whether tangible or intangible, in the basis of any tax upon, or measured by, income.

2. In 1982, Article XIII, § 2 read in part as follows:
 All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law.

not otherwise exempt within the State. The property taxable under § 59–1–1 may be assessed to the person who owns, claims, possesses, or controls it. § 59–5–4.[3]

Article XIII, § 2 of the Utah Constitution and § 59–2–1 exempt from taxation "property of" cities and other governmental bodies.[4] The exemption is based on the policy that property owned by and used for the public benefit of one governmental entity or subdivision should not be taxed by another because that would defeat the purpose of the exemption. For one unit of government, for example, a city, to have to levy a tax so that it can pay taxes to another overlapping unit, for example, a county, makes little economic sense and is bad tax policy. In other words, county taxation of city-owned property would necessarily require additional taxation by the city of its taxpayers for the revenue to pay the county-imposed tax. *Orange State Oil Co. v. Amos*, 100 Fla. 884, 887, 130 So. 707, 709 (1930); *Newton v. City of Atlanta*, 189 Ga. 441, 444, 6 S.E.2d 61, 63 (1939); *City of Idaho Falls v. Pfost*, 53 Idaho 247, 23 P.2d 245 (1933); *Pelouze v. City of Richmond*, 183 Va. 805, 809, 33 S.E.2d 767, 769 (1945); 2 T. Cooley, *The Law of Taxation* § 621, at 1313 (4th ed. 1924); 71 Am.Jur.2d *State and Local Taxation* § 336 (1973). In other words, city taxpayers would, in effect, be subsidizing county taxpayers.

■ But overlapping taxation does not occur when government-owned property is held and used by a private person for private use and profit. In that situation, the property is used as if it were private property, and then a policy favoring taxation

exists. *Cf.* Utah Code Ann. § 59–2–2, § 59–13–73; *Mesa Verde Co. v. Board of County Commissioners*, 178 Colo. 49, 57, 495 P.2d 229, 233, *appeal dismissed*, 409 U.S. 810, 93 S.Ct. 69, 34 L.Ed.2d 65 (1972); *Great Salt Lake Minerals & Chemicals Corp. v. State Tax Commission*, 573 P.2d 337, 340 (Utah 1977). The private entrepreneur who uses government property to make a profit shoulders the direct incidence of the tax burden with the revenues from his business and no additional city tax is needed to cover the property tax assessed by the county against the private property. Furthermore, the established policy that allows taxation in these circumstances is directly supported by the principle that there should be an equal distribution of the tax burden among the entire tax base, absent overriding reasons to the contrary. *See Parson Asphalt Products, Inc. v. Utah State Tax Commission*, 617 P.2d 397, 398 (Utah 1980); *Great Salt Lake Minerals & Chemicals Corp.*, 573 P.2d at 340.

■ Because "[t]he property of ... cities" is tax exempt, we must determine the meaning of § 59–2–1 in light of the policy that underlies the tax exemption. Significant in understanding the scope of the exemption is the statutory provision allowing county assessors to assess property taxes to persons who own, claim, possess or control property. § 59–5–4. *See supra* footnote 3. Also significant is the provision allowing for taxation of private improvements built on state-owned lands, irrespective of the technical legal doctrine of fixtures. *See* Utah Code Ann. § 59–2–2.[5] The fact that a municipality has legal

---

3. In 1982, § 59–5–4 read in relevant part:

> The county assessor must, before the first day of June of each year, ascertain the names of all taxable inhabitants and all property in the county subject to taxation except such as is required to be assessed by the state tax commission and must assess the property to the person by whom it was owned or claimed, or in whose possession or control it was, at 12 o'clock m. of the first day of January next preceding, and at its value on that date.

4. Utah Constitution Article XIII, § 2 read in 1982 in relevant part as follows:

> The property of the state, counties, cities, towns, ... shall be exempt from taxation....

Similarly, § 59–2–1 read in 1982 in relevant part as follows:

> The property of the United States, of this state, counties, cities, towns, ... shall be exempt from taxation....

5. Section 59–2–2 currently reads in part:

> (1) No tax shall be levied upon lands, the title to which remains in the state, held or occupied by any person under a contract of sale or lease from the state.
>
> (2) This subsection does not prevent the taxation of improvements on lands and an interest

title to the land is not determinative of the question whether improvements placed on the land and used for private profit are taxable.

The Colorado Supreme Court has held that the determination of whether improvements on government-owned land leased and used by a private party to conduct a for-profit business qualify for tax exemption depends upon whether the private party or the governmental unit has the most significant incidents of ownership, and not necessarily upon who has formal legal title. *Mesa Verde Co. v. Board of County Commissioners,* 178 Colo. 49, 495 P.2d 229, *appeal dismissed,* 409 U.S. 810, 93 S.Ct. 69, 34 L.Ed.2d 65 (1972). *See also Gunnison County v. Board of Assessment Appeals,* 693 P.2d 400 (Colo.Ct.App.1984); *Southern Cafeteria, Inc. v. Property Tax Administrator,* 677 P.2d 362 (Colo.Ct.App. 1983). *But see Maricopa County v. Novasic,* 12 Ariz.App. 551, 473 P.2d 476 (1970). This principle was even applied by the Colorado Court of Appeals in ruling in favor of a tax exemption for property leased by a county from a private party because the county held the most significant incidents of ownership in the improvements. *Gunnison County,* 693 P.2d at 404.

■ The analysis employed by the Colorado Supreme Court best fits the policy that underlies the tax exemption for municipal property and makes the issue of whether property is taxable turn on economic realities. The approach we adopt allows the taxation of property which is used exclusively by a private person even though legal title is clearly in a governmental agency, as long as the most significant incidents of ownership to the property are in the private user. Thus, the status of the formal legal title, while relevant, is not controlling.

This Court has already, in effect, adopted this view. In *University of Utah v. Salt Lake County,* 547 P.2d 207 (Utah 1976), the University sought a tax exemption for leased medical equipment under a constitutional and statutory provision exempting

from taxation "property of" institutions of higher learning. The Court held that the University's interest was no more than that of a lessee with an option to purchase, and "under the type of lease arrangement described the University has no taxable ownership in the property"; therefore, the exemption would not extend to cover the leased equipment. *Id.* at 209.

*University of Utah* is not inconsistent with *Duchesne County v. State Tax Commission,* 104 Utah 365, 140 P.2d 335 (1943). The question there was whether the exemption for state-owned land extended to real property whose legal title was held by the State as trustee. The State was trustee of certain real property granted by the federal government for the express purpose of providing funds for public schools. The state developed a substantial fund from the sale and rental of these lands. Money from the fund was invested in mortgages on farm property. Upon default, the mortgages were foreclosed and title passed to the State as trustee of the fund. The State owned approximately 17,000 acres it had obtained in this manner in Duchesne County. Before foreclosure, the property had been taxable. This Court held, however, that the farm property became State property for purposes of taxation. It is implicit in the decision that the exemption was proper not only because the State held legal title as trustee, but also because the foreclosures and sales of the mortgaged properties produced a direct public benefit. *Id.* at 379–80, 140 P.2d at 341–42. Moreover, if taxation had been allowed in *Duchesne County,* the money to pay the taxes would have had to come from other taxes collected by the State, contrary to the purposes of the tax exemption.

■ In this case, however, the property is used entirely for private profit and any tax on the property will be paid from those profits. We believe it is clear that the plaintiffs held almost all important incidents of ownership during the tax year 1982. Significantly, (1) the plaintiffs built their own improvements from their own

therein to the extent of money paid, or due, in part payment of the purchase price, whether

an extension of payment has been granted or not prior to the levying of such tax.

plans, (2) they had full use and enjoyment of, and profit from, the improvements, (3) they paid no rent for the improvements that year, (4) they maintained the improvements completely at their own cost, (5) they took a depreciation deduction for 1982 in their federal income tax returns and the leases allowed them to depreciate fully the cost of the improvements for federal income tax purposes, (6) they provided and maintained all necessary insurance coverage to protect the property and the city, (7) they expressly agreed to pay possession and use taxes on the improvements, and (8) they could remove the improvements if the city defaulted on its obligations.[6] In short, the plaintiffs were essentially allowed to treat the improvements as their own. Clearly, they held the most significant incidents of ownership.

A similar result was reached by the Supreme Court of Wisconsin in *Mitchell Aero, Inc. v. City of Milwaukee*, 42 Wis.2d 656, 168 N.W.2d 183 (1969). In that case, Mitchell Aero had constructed improvements at its own expense on leased public lands at a municipal airport. Mitchell Aero paid rent for the land but no rent on the improvements. Other provisions in the lease provided that the lessee could make no alterations without the lessor's prior consent, the lessee was responsible for repair and upkeep of the improvements, the lessee was required to provide insurance for the improvements, and the lessee was allowed to amortize the cost of construction over the term of the lease for both state and federal tax purposes. Under the lease, legal title to the improvements was in the county-lessor. In holding that the lessee had sufficient incidents of ownership to sustain taxation of the improvements, the court stated:

> Under this lease arrangement, some of the rights usually associated with ownership are in Aero and others are in the county.... Such control the county keeps over these hangars is not indica-

tive of true ownership but concerns the operation of the airport....

On weighing all considerations, this arrangement does not pass sufficient incidents of ownership with the paper title to constitute the county the true owner of the hangars....

42 Wis.2d at 665, 168 N.W.2d at 187. *Cf. Air Flite and Serv-a-Plane v. Tittabawassee Township*, 134 Mich.App. 73, 350 N.W.2d 837 (1984) (upholding an exemption from taxes based partially on a finding that the bulk of the rights of ownership belonged to the exempt lessor, an airport commission).

In this case, the Tax Commission concluded that the plaintiffs have more significant incidents of ownership of the improvements than does the city and that the improvements are therefore taxable. Based on the foregoing discussion, we agree.

Affirmed.

HALL, C.J., and HOWE, DURHAM and ZIMMERMAN, JJ., concur.

---

**6.** Because of the nature of Intermountain Piper's operation, its lease with the city was somewhat different. However, the lease was similar to the others in the significant aspects dealing

with dominion and control, and this leads us to the conclusion that Piper, too, "owned" the improvements which were made to the land.