**COUNTY BOARD OF EQUALIZATION OF SALT LAKE COUNTY, State of Utah, Petitioner,**

v.

**UTAH STATE TAX COMMISSION and Evans & Sutherland Computer Corp., Respondents.**

Nos. 940100, 950084.

Supreme Court of Utah.

Nov. 15, 1996.

Mary Ellen Sloan, Douglas R. Short, Salt Lake City, for plaintiff.

Jan Graham, Att'y Gen., Salt Lake City, for Tax Commission.

Ken P. Jones, Salt Lake City, for Evans & Sutherland.

ZIMMERMAN, Chief Justice:

The Salt Lake County Board of Equalization ("Board") seeks review of an order of the Utah State Tax Commission ("Commission") granting Evans & Sutherland Computer Corporation ("Evans & Sutherland") an exemption from Utah's privilege tax. We affirm the Commission's order.

Evans & Sutherland, a for-profit corporation, leases six parcels of land from the University of Utah. The parcels are located in Research Park, which was established "in the public interest" by the University on its property in Salt Lake City. Utah Code Ann. §§ 53B–17–501 to –506. Evans & Sutherland constructed six buildings on the parcels. Pursuant to the lease agreements, any buildings, structures, and improvements constructed by Evans & Sutherland will revert to the University upon termination of the leases.

Evans & Sutherland appealed the Board's assessment of taxes on the land and buildings for the 1991 and 1992 tax years. Before the Board, Evans & Sutherland contended that either the buildings were exempt from taxation or their taxable value should be reduced because of the University's reversionary interest in them. Evans & Sutherland also disputed the Board's computation of the fair market value of the buildings. In addition, Evans & Sutherland maintained that it was exempt from privilege taxes on the land on which the buildings sit pursuant to section 59–4–101(3)(c) of the Utah Code. The Board rejected Evans & Sutherland's arguments. On appeal to the Commission, Evans & Sutherland withdrew its claim that the value of the buildings was subject to the University's reversionary interest but contin-

ued to dispute the Board's valuation of the buildings and to maintain that the land was exempt from Utah's privilege tax.

At the conclusion of its formal adjudication of the issues, the Commission agreed with the Board that the fair market value of the buildings was $24,844,800 in 1991 and $22,844,800 in 1992, exclusive of the land. However, the Commission agreed with Evans & Sutherland that the land on which the buildings sit was and is exempt from the privilege tax.

In its ruling on the privilege tax exemption, the Commission first correctly noted that the land in question was exempt from property taxation because the land is owned by the University, and hence, by the State of Utah. *See* Utah Code Ann. § 59–2–1101(2)(b).[1] Thus, the Commission concluded that "if the land in question is to be taxed at all, it must be taxed according to the provisions of Utah's privilege tax." Utah imposes a privilege tax "on the possession or other beneficial use enjoyed by any person of any real or personal property which for any reason is exempt from taxation, if that property is used in connection with a business conducted for profit." Utah Code Ann. § 59–4–101(1) (1992).[2]

However, Utah also grants certain exemptions from the privilege tax. Under one of these exemptions, no privilege tax is imposed on "the use or possession of property where the proceeds inure to the benefit of a religious, educational, or charitable organization and not to the benefit of any other person." *Id.* § 59–4–101(3)(c) ("exemption 3(c)"). The Commission ruled that because the rents paid by Evans & Sutherland inured to the benefit of an educational organization, namely, the University, the land in question was therefore exempt from the privilege tax. In so ruling, the Commission rejected the Board's argument that the term "proceeds" as used in exemption 3(c) meant all business

"income" or "profits" so as to assure that only property used exclusively for religious, educational, or charitable purposes was exempt from the privilege tax.

■ After Evans & Sutherland's petition for reconsideration was denied by the Commission, the Board sought this court's review of the Commission's conclusion that the land was exempt from the privilege tax. That is the only issue we address in this opinion. Because section 59–4–101 of the Code contains no explicit grant of discretion to the Commission, we apply a correction of error standard to the Commission's conclusions of law. *Eaton Kenway, Inc. v. Auditing Div.*, 906 P.2d 882, 884 (Utah 1995) (citing Utah Code Ann. § 59–1–601(1)(b)).

"We begin by examining the plain language of the statute granting the exemption, *Neel v. State*, 889 P.2d 922, 925 (Utah 1995), while construing it so that it is in harmony with its overall legislative objective." *Eaton Kenway*, 906 P.2d at 886. Section 59–4–101 provides in relevant part:

(1) A tax is imposed on the possession or other beneficial use enjoyed by any person of any real or personal property which for any reason is exempt from taxation, if that property is used in connection with a business conducted for profit.

. . . .

(3) No tax is imposed under this chapter on the following:

(a) the use of property which is a concession in, or relative to, the use of a public airport, park, fairground, or similar property which is available as a matter of right to the use of the general public;

(b) the use or possession of property by a religious, educational, or charitable organization;

---

1. That section provides in relevant part:

> (2) The following property is exempt from taxation:
> . . .;
> (b) property of the state, school districts, and public libraries[.]

Utah Code Ann. § 59–2–1101(2).

2. Section 59–4–101 was amended in 1995 to add an additional exemption not relevant to this opinion. *See* Act of Mar. 1, 1995, ch. 138, § 3, 1995 Utah Laws 448 (codified as amended at Utah Code Ann. § 59–4–101(1) (Supp.1996)). All subsequent references to section 59–4–101 in this opinion are to the version in effect prior to the 1995 amendment.

(c) the use or possession of property where the proceeds inure to the benefit of a religious, educational, or charitable organization and not to the benefit of any other person[.]

Utah Code Ann. § 59–4–101 (1992).

■ Our examination of the plain language of the statute leads us to reject the Board's contention that the term "proceeds" in exemption 3(c) means all business "income" or "profits." If exemption 3(c) is interpreted to mean that Evans & Sutherland must pay over all of its business income or profits to the University to qualify for the exemption, the effect would be the same as if Evans & Sutherland were an educational or charitable organization. The Board's interpretation would render exemption 3(c) meaningless because it would effectively duplicate the immediately preceding exemption contained in subsection 3(b). Consequently, the Board's interpretation of exemption 3(c) fails to give effect to all parts of the statute, which is contrary to our general rules of statutory construction. *See Perrine v. Kennecott Mining Corp.*, 911 P.2d 1290, 1292 (Utah 1996) (citing *Millett v. Clark Clinic Corp.*, 609 P.2d 934, 936 (Utah 1980)).

Further, we observe that in the context of a sale of real property, "proceeds" are the funds received from the sale. *Black's Law Dictionary* defines "proceeds" as "Issues; income; yield; receipts; produce; money or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property." *Black's Law Dictionary* 1204 (6th ed.1990).

*Black's* also states that "issues," in turn, "[a]s applied to real estate, comprehend every available return therefrom, whether it arise above or below the surface. 'Issues' are goods and profits of the land." *Id.* at 832. Accordingly, if property is not sold but merely used or possessed as required by exemption 3(c), then we read the term "proceeds" to mean the rents derived *from* the property, not the lessee's business income or profits, which are derived from factors other than the property, including the business's employees, marketing efforts, and the like. Our reading is supported by the fact that in

subsection 1 of section 59–4–101, the legislature used the words "a business conducted for *profit* " but did not repeat the term "profit" in exemption 3(c). Utah Code Ann. § 59–4–101 (1992) (emphasis added). Therefore, we do not read "proceeds" to mean the same thing as "profit" as that term is used in subsection 1. We therefore reject the Board's contention to the contrary.

Our interpretation of exemption 3(c) is consistent with the legislative history of the privilege tax. We have previously observed that the Utah statute was "intended to close any gaps in the tax laws by imposing a tax on any property possessed or used in connection with a business for profit which was otherwise exempt from taxation. It closely resembles the Michigan statute of similar purpose, which was ... held constitutional in a series of U.S. Supreme Court cases." *Thiokol Chem. Corp. v. Peterson*, 15 Utah 2d 355, 393 P.2d 391, 393 (1964); *see also* Gordon L. Roberts, Note, *The Utah Tax on the Use of Tax–Exempt Property*, 9 Utah L.Rev. 415, 416 (1964) ("Michigan was the first state to enact [a privilege] tax, and after the Supreme Court affirmed the basic design of the Michigan tax in 1958, the Utah legislature followed the Michigan example with alacrity." (footnotes omitted)).

When enacted, the Michigan statute, upon which Utah's privilege tax was based, provided in relevant part:

"When any real property which for any reason is exempt from taxation is leased, loaned or otherwise made available to and used by a private individual, association or corporation in connection with a business conducted for profit, except where the use is by way of a concession in or relative to the use of a public airport, park, market, fair ground or similar property which is available to the use of the general public [sic], shall be subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of such property: Provided, however, That the foregoing shall not apply to federal property for which payments are made in lieu of taxes in amounts equivalent to taxes which might otherwise be lawfully assessed

*or property of any state-supported educational institution."*

United States v. Detroit, 355 U.S. 466, 467 n. 1, 78 S.Ct. 474, 475 n. 1, 2 L.Ed.2d 424 (1958) (alteration in original) (emphasis added) (quoting 6 Mich. Stat. Ann. § 7.7(5) (Supp. 1957)). Thus, the Michigan legislature expressly exempted from its privilege tax "the property of any state-supported educational institution." *Id.* In interpreting the Michigan exemption, a United States court of appeals noted:

> [T]he purpose of the Michigan Legislature in amending the bill so as to include this statutory exemption was to avoid discouraging gifts and bequests to the endowments of state-supported educational institutions. The Legislature was also concerned about the possible tax effect upon the University of Michigan as grantee of Willow Run Airport from the United States.

*Chrysler Corp. v. Township of Sterling,* 410 F.2d 62, 68–69 (6th Cir.1969). The record in that case clearly demonstrates that a corporation representing various airlines leased the Willow Run Airport from the University of Michigan, maintained the premises, and shared in certain expenses. *Id.* at 74 app. A (detailing property leased or loaned by state-supported educational institutions). The court upheld from constitutional attack the exemption the Michigan law grants to for-profit lessees of state-supported educational institutions. *Id.* at 70–71.

Under our interpretation today, exemption 3(c) of the Utah statute accomplishes the identical objective as the Michigan exemption. We note that the Utah legislature apparently intended to also broaden the types of property exempt from Utah's privilege tax, by exempting from the tax any property of the federal government, state government, and local governments which is leased to for-profit religious, educational, and charitable organizations, Utah Code Ann. § 59–4–101(3)(b), and any property used pursuant to a federal grazing lease or permit and for certain nonexclusive leases, permits, and easements. *Id.* § 59–4–101(3)(d), (e).

The lease of property by a government-owned educational organization to a for-profit business falls within the ambit of exemption 3(c) by satisfying the exemption's three statutory criteria: (i) the property in question must be of the type that ordinarily is exempt from taxation; (ii) the property must be used by a private individual, association, or corporation in connection with a for-profit business; and (iii) the rent (or its equivalent) for the property must inure exclusively to a religious, educational, or charitable organization. *See* Utah Code Ann. § 59–4–101 (1992); *cf. Interwest Aviation v. County Bd. of Equalization,* 743 P.2d 1222, 1224 (Utah 1987) (setting forth statutory criteria for concession-aire exemption provided in section 59–4–101(3)(a)). In contrast, land owned and leased by a private, nonprofit educational, religious, or charitable organization to a for-profit business that is not religious, educational, or charitable in nature fails the first prong of the test, as we set forth below, despite the apparent facial availability of exemption 3(c) in such circumstances.

■ To clarify our discussion of the ambit of exemption 3(c), we must first provide some background on Utah property tax exemptions. Under Utah law, property which is owned by a nonprofit entity and which is used exclusively for religious, charitable, or educational purposes is exempt from the property tax. Utah Const. art. XIII, § 2(2)(c); Utah Code Ann. § 59–2–1101(2)(d). We have long held that this exemption does *not* apply when such property is used in connection with a purpose that is not exclusively religious, educational, or charitable in nature. *See Howell v. County Bd. of Cache County ex rel. IHC Hosps., Inc.,* 881 P.2d 880, 884 (Utah 1994) (reviewing standards for determining whether property is used exclusively for charitable purposes); *Yorgason v. County Bd. of Equalization,* 714 P.2d 653, 656–57 (Utah 1986) (same); *County Bd. of Equalization ex rel. Utah County v. Intermountain Health Care, Inc.,* 709 P.2d 265, 269 (Utah 1985) (same); *Loyal Order of Moose, # 259 v. County Bd. of Equalization,* 657 P.2d 257, 261 (Utah 1982) (holding that language granting exemption must be strictly construed); *Odd Fellows' Bldg. Ass'n v. Naylor,* 53 Utah 111, 177 P. 214, 217 (1918); *Parker v. Quinn,* 23 Utah 332, 64 P. 961, 962

(1901). Because Utah's privilege tax applies only when the property in question is otherwise exempt from the property tax, Utah Code Ann. § 59–4–101(1), the privilege tax cannot apply when property owned by a nonprofit entity is not used exclusively for a religious, educational, or charitable purpose, because such property is subject to the property tax. Therefore, such cases fail the first prong of our test, so that the question of the application of the privilege tax and exemption 3(c) simply does not arise.

■ However, this result leads to an apparent anomaly in that the privilege tax and any exemption from it under exemption 3(c) will primarily apply only where an entity conducting a business for profit leases property from a governmental entity that can be characterized as a religious, educational, or charitable organization. This result obtains because property owned by a governmental entity is exempt from the property tax regardless of the way it is used by the for-profit lessee, thus satisfying the first prong of our test for exemption 3(c). *See* Utah Code Ann. § 59–2–1101(2)(a)–(c). It is also conceivable that exemption 3(c) could apply when the property is owned and leased by a nonprofit entity to a for-profit lessee whose business is exclusively religious, educational, or charitable in nature. This scenario may satisfy the first prong of our test because property owned and leased by a nonprofit entity is exempt from the property tax when it is used exclusively for a religious, educational, or charitable purpose. *See* Utah Code Ann. § 59–2–1101(2)(d). As a practical matter, however, our restrictive interpretations of "exclusive use" render this scenario unlikely to occur. *See, e.g., Parker,* 64 P. at 962 ("Where ... a portion of certain property owned by a charitable institution is occupied and used by it for charitable purposes, and the other portion thereof is devoted to purposes of revenue, the portion used and occupied for charitable purposes is exempt, and the portion not so used and occupied is subject to taxation."). Therefore, exemption 3(c) will likely apply primarily where a government-owned educational organization leases its property to a for-profit business. This is true despite the apparent facial availability of the exemption under certain circumstances to private religious, educational, or charitable organizations which lease their property to for-profit entities. *See* Utah Code Ann. § 59–4–101(3)(c).

■ Despite the restrictive practical application of exemption 3(c), our interpretation, in contrast to the Board's, gives some effect to all parts of section 59–4–101 of the Code and is supported by relevant legislative history. We therefore hold that the term "proceeds" in exemption 3(c) refers to the rent or its equivalent that is derived from the property itself, not to the lessee's business income or profits.

■ Anticipating our holding, the Board assails it on two constitutional grounds. First, the Board claims that the privilege tax and exemption 3(c) discriminate against the federal government by taxing its for-profit lessees but not the for-profit lessees of government-owned educational institutions, which amounts to unconstitutional discrimination under the doctrine announced in *Phillips Chemical Co. v. Dumas Independent School District,* 361 U.S. 376, 80 S.Ct. 474, 4 L.Ed.2d 384 (1960). Second, the Board contends that the privilege tax and exemption 3(c) operate to discriminate against nonprofit, private educational organizations, in violation of the equal protection or uniform operation of the laws provision of the Utah Constitution. *See* Utah Const. art. I, § 24 ("All laws of a general nature shall have uniform operation."). Because the Board has standing to raise these constitutional claims, we address them in turn. *See Kennecott Corp. v. Salt Lake County,* 702 P.2d 451, 454–55 (Utah 1985) ("[C]ounties have standing to challenge determinations by the Tax Commission that directly affect the counties' budgeting and taxing functions."); *accord Millard County v. Utah State Tax Comm'n,* 823 P.2d 459, 461 (Utah 1991). We note, however, that in challenging the constitutionality of a tax statute, the Board bears the burden of demonstrating its unconstitutionality. *Amax Magnesium Corp. v. Utah State Tax Comm'n,* 796 P.2d 1256, 1258 (Utah 1990).

We reject the Board's claim that the privilege tax and exemption 3(c) unconstitu-

tionally discriminate against the federal government. We first observe that a federal appeals court rejected this identical claim as applied to Michigan's privilege tax exemption for the property of state-supported schools. *Chrysler Corp.*, 410 F.2d at 67–71. The court first analogized the Michigan statute to the Texas statute at issue in *Phillips*. Under the Texas scheme, one statute exempted from taxation certain lessees of public property, whether owned by a federal, state, or local governmental entity. *Phillips*, 361 U.S. at 379–80, 80 S.Ct. at 476–77. A second Texas statute, however, made such property taxable when the lessor was the federal government. *Id.* at 382–84, 80 S.Ct. at 478–80. In light of this facial discrimination, the Supreme Court held in *Phillips* that "it does not seem too much to require that the State treat those who deal with the Government as well as it treats those with whom it deals itself." *Id.* at 385, 80 S.Ct. at 480.

On the basis of *Phillips*, the appeals court considering the Michigan statute had to address whether "the discrimination created by [Michigan's] exemption in favor of state-supported educational institutions can be justified." *Chrysler Corp.*, 410 F.2d at 68. Because it could find no discriminatory intent on the part of the legislature, because the exemption would apply to a small amount of property relative to the state's taxable real estate base, and because of the extent to which the federal government was involved in directly financing the educational institutions exempted by the Michigan statute, the appeals court held that the statute did not unconstitutionally discriminate against the federal government and its lessees. *Id.* at 68–71.

Unlike the Texas and Michigan statutes, Utah's statute does not facially discriminate against the federal government by singling out its lessees for taxation. *Marquardt Corp. v. Weber County*, 360 F.2d 168, 172 (10th Cir.1966). Moreover, the Board has not identified any concrete set of facts in which similarly situated lessees would be taxed differently under exemption 3(c) solely because one of the lessors is the federal government. Under the Utah statute, a par-

ty leasing property from either a federally or state-owned educational institution in Utah would pay no privilege tax. Because the Utah statute does not facially discriminate, the *Phillips* doctrine is inapposite, and we need not reach the question that the appeals court had to address in *Chrysler Corp.* as to whether the exemption is justified. *Cf. Marquardt Corp.*, 360 F.2d at 172 (holding that Utah's statute does not unconstitutionally discriminate against federal contractors in favor of state contractors because both are treated the same); *Thiokol*, 393 P.2d at 395–96 (same). Moreover, the fact that there may be no federally owned educational institutions in Utah does not thereby render exemption 3(c) discriminatory. *See Marquardt Corp.*, 360 F.2d at 172 ("we do not think the constitutional issue turns on the quantitative equation" as to whether state lessees are more likely than federal lessees to receive exemption for operating concessions under Utah Code Ann. § 59–4–101(3)(a)). We therefore reject the Board's first constitutional claim.

 We also reject the Board's claim that exemption 3(c) discriminates against the lessees of nonprofit organizations in violation of the uniform operation of the laws provision of the Utah Constitution. *See* Utah Const. art. I, § 24. The Board argues that the for-profit lessees of private, nonprofit educational organizations are similarly situated to the for-profit lessees of state or local educational organizations and that denying the privilege tax exemption to the former category of lessees but granting it to the latter is unconstitutional.

 "In scrutinizing a legislative measure under article I, [section] 24, we must determine whether the classification is reasonable, whether the objectives of the legislative action are legitimate, and whether there is a reasonable relationship between the classification and the legislative purposes." *Blue Cross & Blue Shield of Utah v. State*, 779 P.2d 634, 637 (Utah 1989). Moreover, in the tax area, as in other areas of purely economic regulation, "we give broad deference to the legislature when scrutinizing the reasonableness of its classifications and their relationship to legitimate legislative purposes." *Id.*

Under this grant of broad deference, we will uphold a classification if facts " 'can reasonably be conceived' " that would justify the disparate treatment. *Id.* (quoting *Baker v. Matheson,* 607 P.2d 233, 244 (Utah 1979)). We do not accept any conceivable reason for the legislation but judge it on the basis of "reasonable or actual legislative purposes." *Id.* (citations omitted).

The Board asserts that exemption 3(c) classifies for-profit lessees of educational organizations into two groups: those leasing from government-owned educational organizations and those leasing from nonprofit entities. Our analysis must begin with the statutory scheme, "for it determines the classification at issue." *Id.* We begin with Utah's property tax scheme. Under the Utah Constitution and the Utah Code, property of a government—federal, state, or local—is exempt from Utah's property tax. Utah Const. art. XIII, § 2; Utah Code Ann. § 59–2–1101(2)(a)–(c). Both the Utah Constitution and the Code also provide a separate exemption for "property owned by a nonprofit entity which is used exclusively for religious, charitable, or educational purposes." Utah Const. art. XIII, § 2(2)(c); Utah Code Ann. § 59–2–1101(2)(d). Thus, in determining property tax exemptions, a use condition attaches to the property owned by nonprofit entities but no use condition attaches to property owned by a government. Thus, but for the availability of the privilege tax, property leased by for-profit entities from a federal, state, or local government would not be subject to tax, while property leased by for-profit entities from nonprofits would be subject to tax, unless the lessee's business was exclusively religious, charitable, or educational in nature.

Turning to the privilege tax, whose general purpose is to "close any gaps in the tax laws by imposing a tax on any property possessed or used in connection with a business for profit which [is] otherwise exempt from taxation," *Thiokol,* 393 P.2d at 393, we note that the legislature eliminated the tax exemption on property leased by for-profit lessees from the government, unless the government-owned lessor is a religious, educational, or charitable organization that can claim the benefit of exemption 3(c). Utah Code Ann. § 59–4–101 (1992). However, the legislature maintained the identical tax exemption granted to lessees of nonprofits that we find in the property tax exemptions. To explain, because property leased by for-profit lessees whose business is exclusively religious, charitable, or educational in nature could be exempt from the property tax in certain circumstances, such property would then be subject to the privilege tax. However, exemption 3(c) maintains the tax exemption when the nonprofit lessor is a religious, educational, or charitable organization. Thus, exemption 3(c), in tandem with the property tax exemption, imposes two use conditions: both the for-profit lessee and the nonprofit lessor must use the property exclusively for religious, educational, or charitable purposes.

We therefore reject the Board's characterization of the classifications created by the statutory scheme. To claim the benefit of exemption 3(c), any for-profit lessee must meet the initial requirement that its lessor be a religious, an educational, or a charitable organization. Because this requirement applies to all for-profit lessees regardless of whether the lessor is a governmental or nonprofit entity, it does not create any equal protection problems. Next, the scheme groups lessees by attaching a use requirement to their business when they lease from nonprofit religious, educational, or charitable organizations and attaching no use requirement when they rent from government-owned religious, educational, and charitable organizations. We note that this is the identical classification found in article XIII, section 13 of the Utah Constitution and contained in section 59–2–1101 of the Utah Code, both of which pertain to Utah property tax exemptions and neither of which the Board assails.

Having identified the relevant classifications, we next move to the three-step analytical model used to determine compliance with article I, section 24 of the Utah Constitution. Under this model, the first question is whether there is anything inherently unreasonable in the classification because it initially groups all for-profit lessees who lease from religious, educational, or charitable organizations to-

gether but then imposes a use condition on those who lease from nonprofits. *See Blue Cross,* 779 P.2d at 640. On its face, we see nothing unreasonable in the distinction created by the use requirement. One characteristic that distinguishes the two classes of lessees is that government bodies, including Utah's legislature, have both direct and indirect controls over the leasing of property belonging to government-owned educational organizations. Indeed, a specific instance of that control is manifested in the legislation which established Research Park. *See* Utah Code Ann. §§ 53B–17–501 to –506. We have no doubt that if the University were to abuse its leasing powers, the legislature could take corrective measures. In contrast, neither the legislature nor any other government has much, if any, control over the leasing of property owned by private, nonprofit entities. Therefore, we cannot say that the classifications drawn by the statutory scheme and exemption 3(c) have no rational basis. *Blue Cross,* 779 P.2d at 640.

The second issue under our analytical model is whether the objectives pursued by the legislation are legitimate. *Id.* The Commission asserts that exemption 3(c) benefits government-sponsored education, because it allows government-owned educational organizations to rent their property more easily and at a higher price when the lessee is not burdened by privilege tax. We agree. Under analogous circumstances, we upheld a property tax exemption for real estate owned by the Utah State Retirement Fund. *Utah State Retirement Office v. Salt Lake County,* 780 P.2d 813, 816 (Utah 1989). We rejected the claim in that case that the exemption would violate the equal protection requirements of the Utah Constitution because the real estate owned by private retirement funds was subject to the tax. *Id.* We observed, "The Fund's investment property provides income for a purpose which otherwise must be supported by taxation and thus helps to lighten the public burden." *Id.* The same observation applies with equal force to the funding of public educational institutions and underscores the legitimacy of the legislative purpose in the present case. If the privilege tax were imposed on Evans & Sutherland, it would merely effect a revenue shift

from the University, and hence the State, to Salt Lake County.

Similarly, the use restriction imposed on the lessees of nonprofits appears necessary to ensure that the legislature neither expands nor limits the scope of a tax exemption granted by the Utah Constitution. *See Loyal Order of Moose,* 657 P.2d at 261. Exemption 3(c) ensures that lessees of property not subject to the property tax under article XIII, section 2 of the Utah Constitution—the exemption for property owned by a nonprofit entity and used exclusively for religious, charitable, or educational purposes—are also exempt from the privilege tax which otherwise would apply. That, too, is a legitimate legislative objective.

The third question under our analytical model is whether the legislature chose a permissible means to achieve its legitimate ends. *Blue Cross,* 779 P.2d at 641. The Board argues that subjecting the leased property of all educational organizations to taxation would further the "gap-closing" purpose of the privilege tax statute. This argument misses the mark because it essentially urges the elimination of *all* exemptions from the privilege tax statute. The Board has neither mentioned nor addressed the legislative purposes specific to exemption 3(c), including those we identified above, nor has it explained why the means chosen by the legislature impermissibly achieve those purposes by being grossly under- or over-inclusive. *See id.* at 645. Under these circumstances, we determine that the Board has failed to shoulder its burden of proving that exemption 3(c) is constitutionally infirm.

In sum, we affirm the Commission's order that the land leased by Evans & Sutherland from the University is not subject to the privilege tax, and we reject the Board's constitutional challenges to the privilege tax and exemption 3(c).

STEWART, Associate C.J., and DURHAM, J., concur in Chief Justice ZIMMERMAN's opinion.

HOWE, Justice, dissenting:

I dissent. The University of Utah is not an "educational organization" within the

meaning of section 59–4–101(3)(b) or (c) which grants exemptions from the privilege tax. This conclusion is mandated when the exemptions are construed *in pari materia* with provisions of the Utah Constitution and our Revenue and Taxation Code which grant exemptions from ad valorem property taxation.

Until 1983, article XIII, section 2 of the constitution provided for the following property tax exemptions:

> The property of the state, counties, cities, towns, school districts, municipal corporations and public libraries, lots with the buildings thereon used exclusively for either religious worship or charitable purposes. . . .

Because it was not clear from the above exemption whether a nonprofit private or parochial school or university qualified as a "charitable purpose," section 2 was amended by the voters at the general election in November 1982 to provide as follows:

> (2) The following are property tax exemptions:
>
> (a) The property of the state, school districts, and public libraries;
>
> (b) The property of counties, cities, towns, special districts and all other political subdivisions of the state . . .;
>
> (c) Property owned by a nonprofit entity which is used exclusively for religious, charitable or educational purposes[.]

Since statehood, property of the University of Utah has been exempt from taxation because it was "property of the state." This did not change with the 1982 amendment. It did not become exempt because it was property owned by a nonprofit entity which is used exclusively for educational purposes. In other words, section (2)(a) applied, not (2)(c).

This same scheme of exemptions was carried over into the Revenue and Taxation Code, section 59–2–1101, with almost this same wording. Here, again, property owned by the University of Utah is exempt as "property of the state," not as property of a "nonprofit entity which is used exclusively for . . . educational purposes."

Section 59–4–101(3)(b) and (c), which provides for exemptions from the privilege tax, states:

> (3) No tax is imposed under this chapter on the following:
>
> . . .;
>
> (b) the use or possession of property by a religious, educational, or charitable organization;
>
> (c) the use or possession of property where the proceeds *inure to* the benefit of a religious, educational or charitable organization[.]

While the above statutory language is not identical, it is strikingly similar to the language of the constitution and the Revenue and Taxation Code which provides exemptions to property taxation.

In my opinion, we should construe the exemptions to the privilege tax *in pari materia* with the exemptions to the property tax since they are very similarly worded and both seek to benefit the same institutions and organizations. Accordingly, I would hold that an "educational organization" is a nonprofit private or parochial school or university for the purposes of exemptions to the privilege tax. That classification does not fit the University of Utah. This conclusion seems reasonable to me since no reason has been suggested why the lands of the universities and colleges would be exempted from the privilege tax but not any other state-owned lands. Indeed, on its face, it seems incongruent that lands of the state's universities and colleges should be exempt but not the state-owned school trust lands which support grades K through 12 of the public schools.

The foregoing conclusion is buttressed by an examination of the legislative history of the University's Research Park. The Park was authorized by the legislature in 1969. Ch. 11, 1969 Utah Laws (1st S.S.) (later codified as Utah Code Ann. §§ 53–31–57 to – 63, now codified as Utah Code Ann. §§ 53B–17–501 to –506). In the 1969 act, authorization was given for the establishment of the Park "on the property conveyed to the University of Utah under patent from the United States of America dated October 18, 1968."

Although in 1969 the privilege tax, with the same exemptions as exist today, was in effect, having been enacted ten years earlier in 1959, the Research Park Act expressly provided in section 53–31–61(1):

No lands conveyed to the University of Utah by the patent, or improvements or personal property thereon, lying within the research park established under this act shall be subject to taxation under section 59–13–73 [the privilege tax].

However, every lessee in the Park was required to make an annual "contribution" to Salt Lake City "equal to and in lieu of taxes which otherwise would be imposed" as a condition to receiving municipal services which Salt Lake City was required to provide to the Park. Utah Code Ann. § 53–31–61(2). It thus appears that the legislature in 1969 did not consider the exemptions to the privilege tax broad enough to cover the Research Park and express provision was made in the Act to exempt those lands.

In 1983, the legislature enacted chapter 160, 1983 Utah Laws, which repealed section 53–31–61, "which exempt[ed] the lands in Research Park from the privilege tax and requir[ed] that in lieu payments be made as part of the lease." However, there was no repeal of section 53–31–62 (now 53B–17–505), which requires Salt Lake City to provide municipal services. In view of the express repeal of the exemption, I am led to conclude that the legislature did not intend that lands in the Park would nevertheless remain exempted under the provisions of the privilege tax which theretofore had not been applicable.

The majority opinion leaves all lessees in the Park, many of whom, like Evans and Sutherland, are for-profit corporations, without any liability for ad valorem or privilege taxes, or even for a "contribution" to the city or county for the municipal services they receive. I do not believe that was ever the legislature's intent.

RUSSON, J., concurs in Justice HOWE's dissenting opinion.