MITCHELL AERO, INC., Appellant, v. CITY OF MILWAUKEE, Respondent.

*No. 228. Argued April 1, 1969.—Decided June 3, 1969.*
(Also reported in 168 N. W. 2d 183.)

For the appellant there were briefs by *Foley, Sammond & Lardner,* attorneys, and *Robert A. Christensen* of counsel, all of Milwaukee, and oral argument by *Mr. Christensen.*

For the respondent there was a brief by *John J. Fleming,* city attorney, and *Walter J. Schutz,* assistant city attorney, and oral argument by *Mr. Schutz.*

HALLOWS, C. J.   Aero is engaged in a noncommercial aviation business at General Mitchell Field and constructed Hangar No. 3 Addition in 1962 at its own expense on land leased from the county.   It reported the building as its property for tax purposes from 1962 through 1965; Hangar No. 4 was constructed by Aero at its own expense between September 2, 1965, and April 12, 1966, also on land leased from the county.   This lease is dated September 2, 1965, and it is claimed by Aero that under the terms of this lease and of a bill of sale the hangars are owned by the county within the meaning of sec. 70.11 (2), Stats.[1]

---

[1] "70.11 **Property exempted from taxation.** The property described in this section is exempted from general property taxes:
". . .

The basic issues on this appeal are: (1) What is the meaning of the word "owned" in the phrase "property owned by any county" in sec. 70.11 (2), Stats.; and (2) does the lease and other facts constitute the county of Milwaukee the owner within the meaning of that section?

We start with the conceded fact that legal title to the hangars is in the county. Aero contends the word "owned" in the section means "title" and relies principally upon *Aberg v. Moe* (1929), 198 Wis. 349, 224 N. W. 132, 226 N. W. 301. It is quite true in this case the court construed the word "owned" in sec. 70.11 (1), Stats., exempting state-owned property from taxation, to mean bare legal title rather than beneficial ownership. In *Aberg,* a co-op conveyed land and buildings to the board of regents of the university in consideration of a lease back for a term of thirty years. The city of Madison assessed the leasehold interest to the co-op. This court, in holding the legislature had not authorized a property tax on a leasehold, stated the city of Madison had no right to go behind the transaction and attempt to have it declared void for the purpose of placing the property upon the tax roll. The court further stated that under sec. 70.11 (1), in respect to the state and its agencies, it was the title rather than the use which determined whether or not the property was exempt. This language was used to emphasize that some exemptions to religious and scien-

"(2) MUNICIPAL PROPERTY; EXCEPTION. Property owned by any county, city, village, town, school district, metropolitan sewerage district, municipal water district created under s. 198.22 or town sanitary district; lands belonging to cities of any other state used for public parks; land tax-deeded to any county or city before May 2; but any residence located upon property owned by the county for park purposes which is rented out by the county for a nonpark purpose shall not be exempt from taxation. Except as to land acquired under s. 59.965 (5) (d) this exemption shall not apply to land conveyed after August 17, 1961 to any such governmental unit or for its benefit while the grantor or others for his benefit are permitted to occupy the land or part thereof in consideration for the conveyance."

tific bodies also require a certain use as well as ownership.

The bare legal title language was explained and somewhat eroded in *State ex rel. Wisconsin University Building Corp. v. Bareis* (1950), 257 Wis. 497, 44 N. W. 2d 259. In *Bareis* the city of Madison assessed real estate taxes on property held by the University Building Corporation, a dummy corporation of the board of regents. This court held the property was exempt from taxation. The reasoning was that although title in the real estate was in the name of the dummy corporation, it was clear the land was held for the benefit of the university and thus the beneficial owner was the state of Wisconsin. The court took a more realistic view than it did in *Aberg* and reasoned it would look for and make a determination of the real beneficial owner of the property claimed to be exempt from taxation. Thus the court held "owned" in the statute meant beneficial ownership, not mere technical title. In taking this view, this court stressed the substance of the transaction and not the form for the purpose of tax exemption in favor of the state.

It may be true this court has in more recent times again stressed form in dummy corporation cases to permit internal state improvements and avoid the state debt limit, but the tax exemption cases seem to be consistent in construing "owned" as meaning something substantially more in the way of enjoyment or the possession of other indicia of ownership than bare or paper title.

Aero's contention that title equals ownership under this section is not supported by *Wolf River v. Wisconsin Michigan Power Co.* (1935), 217 Wis. 518, 259 N. W. 710, 98 A. L. R. 1369, and *State v. Jelco* (1957), 1 Wis. 2d 630, 85 N. W. 2d 487, 86 N. W. 2d 428. These cases do not equate title with ownership but support the view that beneficial ownership is the proper meaning of "owned" in tax exemption statutes. In *Wolf River*, the defendant,

an electric power company, conveyed 1,400 acres of land to the Valley Camp Association for the exclusive use of the Boy Scouts. The deed reserved a right of reentry for a breach and provided an option to repurchase the property. This court held the land was exempt from real estate taxes because owned by the Boy Scouts within the meaning of sec. 70.11 (36), Stats. 1933. The right of reentry and the option to repurchase were not sufficient to destroy "ownership" based upon title and actual possession.

In the *Jelco Case,* the state brought a suit to recover motor vehicle registration fees allegedly owed on school buses. It was provided in sec. 85.01 (4) (g), Stats. 1951, that the "owner" was to pay the fee. The school districts had been given legal title to the buses by the defendant but were required to transfer legal ownership back at the end of the school year. The buses carried a sign on them stating they were owned and operated by the school district. The school districts had a hold-harmless obligation to the defendant, carried liability insurance and had possession and control of the buses. This court held the buses were owned by the school districts, stating that the case was not one "where bare legal title was vested in school districts and all other incidents of ownership remained in the defendant."

In the instant case the trial court in finding the hangars taxable relied on the reasoning in *American Motors Corp. v. Kenosha* (1957), 274 Wis. 315, 80 N. W. 2d 363, which applied the true or beneficial-ownership test for tax exemption. In the *American Motors Case* the corporation had entered into a contract with the United States for the manufacture and supply of aircraft engines and repair and replacement parts. The contract provided the title to all parts, materials, inventories, and work in process, should vest in the United States upon making any partial payment. The city of Kenosha assessed the personal property tax on the aircraft en-

gine inventory. This court recognized that title and ownership were two different things and said the unrestricted right of the company under the contract to acquire and dispose of the property and the risk of loss were elements of ownership in American Motors Corporation inconsistent with the vesting of title in the government and the property was not owned by the federal government although legal title was transferred.

Analogous cases construing the word "owned" in other tax exempt statutes are: *Armory Realty Co. v. Olsen* (1933), 210 Wis. 281, 246 N. W. 513 (sec. 70.11 (16), Stats. 1929, "owned by any regiment . . . and used for . . ."); *Ritchie v. Green Bay* (1934), 215 Wis. 433, 254 N. W. 113, 95 A. L. R. 1081 (under land contract the property is "owned" by the vendee within the meaning of sec. 70.11 (4), Stats. 1933, exempting from taxation property "owned" by lodges); *Hahn v. Walworth County* (1961), 14 Wis. 2d 147, 109 N. W. 2d 653, 94 A. L. R. 2d 618 (Under trust the *cestui que* trust may be "owner" of property under sec. 70.11 (4), exempting from taxation property "owned" by a benevolent institution.) *See also* 27 Op. Atty. Gen. (1938), 551. *Offutt Housing Co. v. Sarpy County* (1956), 351 U. S. 253, 261, 76 Sup. Ct. 814, 100 L. Ed. 1151; *Corliss v. Bowers* (1930), 281 U. S. 376, 378, 50 Sup. Ct. 336, 74 L. Ed. 916.

We think the ownership of property by a municipality to qualify for exemption under sec. 70.11 (2), Stats., means real or true ownership and not paper title only. Ownership is often referred to in legal philosophy as a bundle of sticks or rights and one or more of the sticks may be separated from the bundle and the bundle will still be considered ownership. What combination of rights less than the whole bundle will constitute ownership is a question which must be determined in each case in the context of the purpose of the determination. In this case for exemption one needs more than the title stick to constitute ownership.

The trial court examined the lease in the light of the facts and concluded that Aero had sufficient ownership to sustain the taxation of the hangars. We agree. The lease of September 2, 1965, provided the county would lease certain lands and other buildings at Mitchell Field to Aero for a term of twenty years with an option to renew for five years. Aero was required to pay rent for the land and these buildings but no rent was to be paid for Hangar No. 3 Addition and for Hangar No. 4 which was to be built. In the event that Aero exercised its five-year option, no rent was to be paid for Hangar No. 4, but rent based on square footage of floor space would be paid for Hangar No. 3 Addition.

Paragraph 11 of the lease provided that the lessee should have a right to construct Hangar No. 4 and in paragraph 13 upon its completion the title thereto would immediately vest in the county "without compensation to Lessee or any consideration other than the leasehold rights granted hereby, and the Lessee shall not have the right to remove same upon termination of this lease." There were other provisions, *i.e.*, that the lessee could make no alterations without prior consent of the lessor; if such alterations were made they should be made without cost to the lessor; and upon their completion would become the property of the lessor.

In respect to Hangar No. 3 Addition the lessee by paragraph 30 agreed to convey to the lessor the title at no cost to the lessor and free and clear of all encumbrances. By paragraphs 20 and 33 (a), Aero was responsible at its own costs for the repair and the upkeep of the hangars including all structural elements. However, as to other buildings under the lease, the maintenance of other structural elements was assumed by the county. In paragraph 32 (f) of the lease Aero was required to procure fire and extended insurance coverage for Hangar No. 4 to the extent of 80 percent of the insurable value. Lessee was obligated to use any sums received in settle-

ment of claims to the immediate repair of any damage to the hangar.

In another part of the lease all costs incurred by the lessee in repair and upkeep of any building following damage by fire, explosion or windstorm, or other cause, were not reimbursable by the lessee in the event of condemnation. The lease is silent on who pays for the repairs in the event of fire if the insurance proceeds received by the lessee are not sufficient to make such repairs. The compulsory standard fire policy in Wisconsin, ch. 203, Stats., insures only to the extent of the insured's interest; consequently, the intent of the parties to the lease must have been that the lessee had a substantial insurable interest in the hangars since it was required to insure up to 80 percent of the insurable value.

Paragraphs 35 and 38 provided that in the event the county condemned the leased land or if the airport was abandoned as an air terminal or the lessor breached a provision of the lease so as to terminate it, the lessor shall "as full compensation for such transfer of title, pay to Lessee a sum of money equal to Lessee's unamortized investment in the improvements constructed by Lessee on said leased premises and existing at the date of the taking, computed on the basis of Lessee's investment cost . . . less five per cent (5%) of such sum for each year subsequent to the date of the completion of the construction of such improvements . . ." This provision of the lease assures to the lessee under these conditions its investment cost of the hangars on an amortized basis if it does not enjoy the possession and use of the buildings for the full term of the lease. It is stipulated the lessee amortizes its cost of construction of the hangars as leasehold improvements over the term of the lease for both state and federal income-tax purposes. If the land is condemned by the United States or the state of Wisconsin during the term of the lease, Aero's only claim is against such government.

Under this lease arrangement, some of the rights usually associated with ownership are in Aero and others are in the county. The lease bears a striking resemblance to the *Aberg* lease, but the holding in that case has been shaken by more recent decisions. This arrangement does not constitute a conventional conveyance and leaseback and there are several provisions in the lease inconsistent with or certainly unusual in a conventional lease of land and buildings. Such control the county keeps over these hangars is not indicative of true ownership but concerns the operation of the airport. We cannot view this arrangement as a bona fide conveyance of the buildings, the cost of which is treated as prepaid rent. It does not purport to be that. This is a hybrid arrangement, possibly to obtain both a tax exemption and the amortization of the cost of the buildings over a relatively short period of twenty years.

On weighing all considerations, this arrangement does not pass sufficient incidents of ownership with the paper title to constitute the county the true owner of the hangars within the meaning of "owned" in sec. 70.11 (2), Stats.

*By the Court.*—Judgment affirmed.

ROBERT W. HANSEN, J. (*dissenting*). Yesterday it was the county of Milwaukee that sought to expand its airport facilities, without using public monies for construction costs, by arranging to have an airport tenant build two hangars at private expense on public land with the hangars to revert to the county after a period of leasehold use. Tomorrow it almost predictably will be the city of Milwaukee that will seek to expand its harbor or similar facility by arranging for an expansion, using private funds to build on public land expanded warehouse or transshipment facilities, such facilities to revert to the city after a period of leasehold use. Today the city wins, tomorrow the county, in the effort to tax such privately

financed public improvements on public land. The apparent winner: The hard-pressed taxpayer, adding at least a mite to the tax base, city or county, in each case. However, the victory may well be pyrrhic if the result is that airport, harbor or similar public facilities can be expanded only with public funds used for the construction of new or improved public-serving facilities.

However, it is not for this court, or any court, to weigh or choose between the public policy alternatives involved. That is for the legislative branch of our government. The sole question before us is whether the hangars the city seeks to tax are county property or privately owned property. The facts are stipulated and adequately summarized in the majority opinion. The controlling Wisconsin cases are set forth in the majority opinion. Paths diverge only in the application of such prior holdings to the fact situation here presented.

It is conceded by the city that legal title to the hangars is in the county of Milwaukee. It is, however, substance, not form that controls. True ownership for tax exemption purposes involves more than bare-bones legal title.[1] The ownership referred to must include or must mean beneficial or actual ownership, not merely technical legal title.[2] Particularly, in cases involving the state or its subdivisions, it is such true ownership, rather than the use of the property which is to determine whether or not the property is exempt.[3]

The majority reverses no earlier ruling in this area, so the writer joins in analyzing such applicable prior holdings of this court in this general area. The majority

[1] *American Motors Corp. v. Kenosha* (1957), 274 Wis. 315, 80 N. W. 2d 363, affirmed 356 U. S. 21, 78 Sup. Ct. 559, 2 L. Ed. 2d 578.

[2] *Aberg v. Moe* (1929), 198 Wis. 349, 224 N. W. 132, 226 N. W. 301.

[3] *State ex rel. Wisconsin University Building Corp. v. Bareis* (1950), 257 Wis. 497, 44 N. W. 2d 259.

starts with the *Aberg Case*,[4] finding a "striking resemblance" between the terms of the lease in that case and the lease here involved. There a private business conveyed certain land with improvements by bill of sale to the board of regents of the state university in consideration for a leaseback for a term of thirty years. Here the land involved was county property before the county of Milwaukee arranged for the building of the hangars at Aero expense. Here the land itself remained and remains publicly owned, nontaxable property. In *Aberg* this court refused to permit the city assessor to assess the leasehold interest against the lessee and thus divide up the property for the purposes of taxation. That is exactly what is being permitted in the case before us.

The majority quotes with greater enthusiasm the *Wisconsin University Building Corp. Case*.[5] There this court held exempt from city real estate taxes property held by a dummy corporation because, although title to the real estate was in the name of the dummy corporation, the land was held for the benefit of the university. This the majority terms a "more realistic view." That may well be true, but how it helps undergird a finding of taxability in the case before us is not at all clear. If the building there served a public purpose, the hangars here serve a similar public purpose. Airports are not universities, but both are public in purpose. The most applicable quote from the dummy corporation case: "When public property is involved, exemption is the rule and taxation the exception." [6]

Next the majority cites the *Wolf River Case*.[7] There an electric power company operating for profit owned 1400 acres of land not yet ready for development or exploita-

---

[4] *Aberg v. Moe*, supra.

[5] *Wisconsin University Building Corp. v. Bareis*, supra.

[6] *Id.* at page 501.

[7] *Wolf River v. Wisconsin Michigan Power Co.* (1935), 217 Wis. 518, 259 N. W. 710, 98 A. L. R. 1369.

tion in its business. It conveyed this land to the Valley Camp Association to be used as a Boy Scout camp. The deed provided for a right of reentry if the land was ever used for other purposes. More importantly, the deed provided for the right of the power company to repurchase the property at the same price for which it was sold. Transparently, this arrangement put the property in tax-exempt cold storage only until the company wanted it back. Then the right to repurchase could be exercised. Nonetheless, this court held the property, for as long as the camping association held it, tax exempt. In the case before us, the land is forever and ever public land and the hangars were conveyed by bill of sale to the county, subject only to the right of Mitchell Aero, Inc., to occupy and use the lease for a fixed period of time. In finding the power company not to be the true owner when it retained the right to repurchase the property at the same price it had "sold" it, seems to stretch the true ownership test in favor of nontaxability. In the case before us, the stretching is in the opposite direction.

The next case cited in the majority opinion, and for us the last one dissected, is the *Jelco Case*.[8] There the state sued for recovery of motor vehicle registration fees allegedly owed on certain school buses. The applicable statute required the "owner" to pay such fees.[9] Legal title to the buses involved had been given to the school districts in which they were used. However, such districts were required to transfer legal ownership back to the private owner, the defendant, after a certain time. In actual effect the school districts "owned" the buses for only ten months of each year, the school year. The holding that the school districts involved were the "owners" of the buses might have its critics. However, at both legal title and what the decision called "exclusive possession and dominion over the buses" for ten of each twelve

---

[8] *State v. Jelco* (1957), 1 Wis. 2d 630, 85 N. W. 2d 487, 86 N. W. 2d 428.

[9] Sec. 85.01 (4) (g), Stats. 1951.

months during the contractual period [10] were in the school districts. This seems hardly on all fours with a situation where a full legal title to the hangars was transferred to the county, and the right to use was in effect no more than the right of a lessee under a lease.

In each of these four cases various indicia of ownership were considered and evaluated. Such weighing and weighting to determine true ownership is not always easy. However, it would be the writer's opinion that the four parties in interest found to be the true owners—the university board of regents in the first two cases, the scout camping association and school districts in the other two, had fewer indicia of ownership than the county of Milwaukee has in the case before us. The four parties in interest found not to be true owners in the four cases —the private corporation, the dummy corporation, the power company and the school bus renters—all appear to have had more indicia of ownership than the Aero company holds here.

In testing not alone the form but also the substance of the transaction here involved, it appears to the writer that upon the execution of the bill of sale from Aero to the county of Milwaukee covering the two hangars, the true owner of such hangars became the county. The lease between Aero and the county has some unique features, but the status of Aero is no more than that of a lessee. Its so-called reversionary interest is no more than an equitable adjustment in the event of abandonment of the airport, condemnation by the county or breach of lease by the county. If Aero breaches the lease, its interest in the hangars becomes zero. If the state or federal government condemn the buildings, Aero's only claim for losses sustained is against such governments. No modification of the buildings can be performed by Aero without the written consent of the county. Use of the hangars is restricted by the lease and subject to the

---

[10] *State v. Jelco, supra,* at page 636.

approval of the airport director. Aero's rights to use the property as lessee are set forth in the lease, as might well have been done in identical language if the county had built the hangars with public funds and then leased its hangars to Aero. The rent would likely have been higher in such case because the lease undoubtedly includes an amortization of the cost of the initial construction during the period of the lease. However, this factor of reduced rental and some risk of loss does not change the status of the county as true owner, and of Aero as lessee only.

The majority opinion and this dissent accept the true ownership test in determining taxability. This disposes of the city's contention that, regardless of who owns the property, a possessory interest such as a leasehold is taxable. This part of the *Aberg* decision has neither been repealed by the legislature nor reversed by this court.[11]

If the county of Milwaukee is the true owner of the two hangars, as this dissent argues it is, the hangars are exempt under sec. 70.11 (3), Stats. There is an exception to such tax exemption in sec. 70.11 (2) reading: "[T]his exemption shall not apply to *land* conveyed after August 17, 1961, to any such governmental unit or for its benefit while the grantor or others for his benefit are permitted to *occupy the land or part thereof in consideration for the conveyance.*" (Emphasis supplied.) This exception explicitly is limited to land. The city here has assessed the hangars as personal property and it can hardly now claim them to be "land." Another statute, sec. 70.174, provides that improvements on government owned land

---

[11] "No doubt the legislature might empower the assessor to assess the leasehold interest against the lessees and so divide up the property for the purposes of taxation. That, however, has never been the policy of our law so far as we know except for a brief period when the state undertook to tax the respective interests of the mortgagor and mortgagee separately. The entire property, including all interests in it, is assessed to the owner of the property as defined in the statute . . ." *Aberg v. Moe, supra,* at page 359.

may be assessed either as real or personal property to the person making the same, or to the occupant thereof or the person receiving benefits therefrom. However, this statute is limited to "land within this state *owned by the United States.*" (Emphasis supplied.) It has no application here. In the absence of a provision authorizing taxation of improvements on lands leased from municipal-taxing authorities, sec. 70.11 (2) controls and exemption follows if the true owner is in fact a county or municipality. Unless and until the legislature speaks, this court is bound by the language of sec. 70.11 (2).

The majority opinion equates ownership with possessing a bundle of sticks, stating that one or more of the sticks may be separated from the bundle and the remainder of the bundle may still constitute ownership. The majority states that what combination of rights less than the whole bundle will constitute ownership is a question which must be determined in each case. With all this the writer agrees. Then the majority counts the sticks, and finds only one stick, that of title, in the hands of the county. By our count, only one stick, that of the right to use under the lease for a specified period of time, remains in the hands of Aero. In making out a case against Aero one needs more than such single stick (the right to occupy under a lease) to constitute ownership. The writer would reverse and remand, with instructions to enter judgment for the plaintiff as prayed for in the complaint.