MILWAUKEE REGIONAL MEDICAL CENTER, INC.,
Plaintiff-Respondent-Cross-Appellant,†

v.

CITY OF WAUWATOSA,
Defendant-Appellant-Cross-Respondent.

Court of Appeals

*No. 2005AP1160. Oral argument May 23, 2006.*
*—Decided June 20, 2006.*

2006 WI App 139

(Also reported in 720 N.W.2d 161.)

† Petition to review granted 9/12/07.

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of and oral argument by *Beth Thorson Aldana*, assistant city attorney, of the City of Wauwatosa.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of and oral argument by *Margaret M. Derus*, of *Reinhart, Boerner, Van Deuren, S.C.*, of Milwaukee.

Before Wedemeyer, P.J., Fine and Kessler, JJ.

¶ 1. FINE, J. The City of Wauwatosa appeals the trial court's order granting summary judgment to the Milwaukee Regional Medical Center, Inc., declaring that the Regional Medical Center was entitled to a property-tax exemption for the tax years 2001, 2002, and 2003, under Wis. Stat. § 70.11(2) for the Center's daycare facility on Milwaukee County land under a long-term lease, and directing that Wauwatosa refund to the Medical Center property taxes it paid under protest for those years. The Regional Medical Center cross-appeals, seeking review of the trial court's non-dispositive determination that the Center was not entitled to a property-tax exemption under § 70.11(4) for the Center's daycare facility for those years.[1] We reverse the trial court's order.

[1] The Milwaukee Regional Medical Center's cross-appeal seeks affirmance of the trial court's grant of summary judgment to it, albeit on a different ground. Although a cross-appeal is necessary when the cross-appellant seeks to modify either the judgment or order from which the appellant appeals, a cross-appeal is not necessary when the cross-appellant seeks an affirmance of the judgment or order, but on a different ground than that given by the trial court. *See* Wis. Stat. Rule 809.10(2)(b) ("A respondent who seeks a modification of the judgment or order appealed from or of another judgment or order entered in the same action or proceeding shall file a notice of cross-appeal."); *Wisconsin Bell, Inc. v. Wisconsin Dep't of Revenue*, 164 Wis. 2d 138, 141 n.2, 473 N.W.2d 587, 588 n.2 (Ct. App. 1991) (cross-appeal not necessary to review errors that, if corrected, would sustain the judgment); *State v. Holt*, 128 Wis. 2d 110, 124, 382 N.W.2d 679, 687 (Ct. App. 1985) ("It is well-established that if a trial court reaches the proper result for the wrong reason, it will be affirmed.").

# I.

¶ 2. The facts material to this appeal are not disputed, and, where appropriate, we quote from the parties' written stipulation.

¶ 3. The Regional Medical Center is a consortium of the following members: Children's Hospital of Wisconsin, Froedtert Hospital, the Medical College of Wisconsin, Curative Care Network, Milwaukee County Behavioral Health Division, and the Blood Center of Southeastern Wisconsin.[2] It is a charitable organization under federal law and, accordingly, is exempt from federal income taxation.

¶ 4. The Regional Medical Center leases land on the Milwaukee County Institutions Grounds in Wauwatosa from Milwaukee County. The County has title to the land, which is approximately one and three-quarters of an acre, and was leased to the Center by the County in 1990 for fifty years and for the specific purpose of permitting the Center to build the daycare facility, which the Center did in 1991. The Center pays Milwaukee County rent of one dollar per year for thirty years, which is also the projected "life" of the daycare building for straight-line depreciation purposes. After the thirtieth year, the parties agreed to agree on an appropriate rental for the land, and, if they could not agree, the lease sets the rental at ten-percent of the land's fair-market value, "disregarding any increment in value due to improvements made by" the Center.

---

[2] The parties' stipulation names one of its members as the "Blood Center of *Southwestern* Wisconsin," but this appears to be a typographical error because the Center's financial statements in the Record designate the member as the "Blood Center of Southeastern Wisconsin." (Emphasis added.)

¶ 5. According to the parties' stipulation, the building "is a two-story facility custom-designed for child care and includes 16 classrooms, 2 offices, kitchen, indoor play area, mechanical room, and adult and children's bathrooms." Additionally, the daycare complex includes "four fenced patios, two fenced playground areas, a garage and two parking lots with 59 surface parking stalls." The daycare facility was built with financing supplied by tax-exempt bonds, and the Regional Medical Center services the debt.

¶ 6. The daycare facility "provides year-round comprehensive programs for children age six weeks through six years, along with school age and summer programs for children through age 12." The programs have a large educational component for each age group that is appropriate to that age group. The facility is managed by a company that is not related to the Center, and is paid a flat fee by the Center (ranging, for the years material to this appeal, from $48,000 to $60,000). The teachers and staff at the daycare facility are, however, paid by the Center.

¶ 7. As of October 2001, 151 children were enrolled in the daycare program. This rose to 193 as of November 2002, and to 216 as of December 2003. The daycare facility draws children from "employees and students of the Milwaukee Regional Medical Center, its member organizations and the general public."[3] The daycare facility does not give preference to children whose parents are connected to the Center or its members. Indeed, not only does the Center advertise the daycare facility to the general public, but a substan-

---

[3] Other than the children enrolled in the daycare facility, it is not clear from the Record that the Regional Medical Center has any "students" as such.

tial percentage of the children in the facility come from that community, ranging, for the years material to this appeal, from a low of approximately thirty-three percent to a high of forty-seven percent. Children from both communities (those whose parents are connected to the Center or its members, and those who are not) pay fees to attend the daycare facility. "The revenues from the operation of the day care center are segregated in a separate account and used for the operation of the Day Care Program, including upkeep of the Building and grounds, painting, maintenance, remodeling and debt retirement."

¶ 8. The lease required that the projected daycare facility have "a minimum construction cost of $400,000," and that construction not start until the County approved the facility's "plans and specifications." The County also had to approve any "material changes" in those plans and specifications, as well as any "[a]ddditions, additional buildings and alterations to the facility costing in excess of $50,000." No County approval is required, however, "[f]or projects not exceeding a cost of $50,000," unless those projects involved adding to the facility or constructing "additional buildings" on the land.

¶ 9. The lease permitted the Center to finance construction any way the Center saw fit, and allowed the Center to mortgage its leasehold interest in the land. Further, to facilitate financing, the County agreed that it would consider modifications to the lease if requested by one or more sources of financing for the project, and that these modifications could include "the subordination of [Milwaukee County]'s fee interest in the [land] to any leasehold mortgage."

¶ 10. The lease required the Regional Medical Center to "minimize any interruption of full and com-

plete public usage as per site plan during all phases of construction," and required the Center to "restore all roadways to the same or similar condition as existed prior to the commencement of construction." The Center had to pay Milwaukee County for its water and sewer charges, and, initially, also had to buy electricity from Milwaukee County, although this requirement was later rescinded. The Center also had to "provide needed security for the interior of" the facility, and pay its pro rata share "of exterior common area security."

¶ 11. As we have seen, Milwaukee County leased the land to the Regional Medical Center for the specific purpose of building a daycare facility. Thus, the lease essentially restricts use of the land to that purpose:

> The [land] and Facility shall be used as a child care center to serve employees and students of the Milwaukee Regional Medical Center, its member organizations and the general public and for no other purpose, without the prior written consent of [Milwaukee County]. [The Center] shall not lease space in its Facility to any person or entity without the prior written consent of [Milwaukee County] which consent shall not be unreasonably withheld. Failure to comply with this requirement shall be deemed a breach of this lease.

The lease also required the Center, at its "sole cost and expense" to get "fire insurance with an extended coverage endorsement against loss or damage to the Facility in an amount equal to at least eighty percent (80%) of the full insurable value of the Facility, which shall be determined on a replacement cost basis, less physical depreciation of the Facility." (Parenthetical in original.) Milwaukee County had to be named "as a co-insured." The Regional Medical Center also had to get "a public liability insurance policy," with the County on the policy as "an additional insured."

218

¶ 12. If the land on which the daycare facility was built was taken in whole or in part by condemnation or its equivalent, so that, "in the sole opinion" of the Regional Medical Center, the Center could not effectively run its daycare facility, the lease would end, and Milwaukee County would receive that part of the award that was attributable to the land, without considering value added to the land by the daycare facility. The balance of the award would go to the Center. If, however, the Center, in its "sole opinion," determined that it could still run the daycare facility on the land not taken, the lease would not end and the Center could use all of the condemnation award to reconfigure the facility. In reconfiguring the facility, the Center was not required to adhere to the original plans and specifications, as long as the quality of the facility was not impaired. Any money left over after the reconfiguration would be split between the County and the Center, with the County getting the part attributable to the land's value (again, not affected by any value added by the facility), and the Center getting the rest.

¶ 13. The lease also included various provisions affecting the Center's use of the property. Thus, the Center was allowed to place appropriate signage on the property, and had to keep the land and the facility in a "good, clean, safe, secure and sanitary condition," performing whatever maintenance was reasonably required. The Center also had to properly fence the facility so as to reduce the risk of injury to the children using it. Further, Milwaukee County has the right, upon proper notice to the Center, to enter the land "at reasonable times for the purpose of examining and inspecting whether [the Center] has or is performing [the Center]'s covenants" under the lease, and also to examine, maintain, repair, or replace the County's "util-

219

ity lines." The Center also has to pay its pro rata share of the County's cost of a Wauwatosa fire station on the Milwaukee County Institutions Grounds.

¶ 14. Although the Center has title to the daycare facility for the duration of the lease, once the lease runs out, title to the facility (excluding the Center's movable property) would, "at the option of Milwaukee County, vest in Milwaukee County . . . free and clear of mortgages, liens or encumbrances." During the lease term, the Center could not, without the prior written approval of the County, sublet either the land or the building. Significantly, under the lease, if the Center makes "substantial capital expenditures" within ten years of the lease's termination, the County must reimburse the Center for "the unamortized value of their replacement cost."

¶ 15. As we have seen, this appeal concerns Wauwatosa's assessment of the Regional Medical Center's daycare facility, both the land and the building, for property taxes for the years 2001, 2002, and 2003. The Regional Medical Center paid the taxes under protest and then brought this action seeking a refund, which the trial court ordered.[4]

## II.

¶ 16. The issue presented by both the appeal and by the cross-appeal is whether the Regional Medical Center is exempt from taxes levied by Wauwatosa for

---

[4] Wauwatosa did not tax the Regional Medical Center facility in the 1990s because, as counsel for the City indicated at oral argument, the taxability of the property apparently was then below the City's radar. The Center does not claim that the City's inaction during the 1990s affects its liability for the assessed years.

2001, 2002, and 2003. As we have seen, the Center contends that it is exempt either under WIS. STAT. § 70.11(2), as the trial court determined, or, alternatively, under § 70.11(4). Our review is *de novo*. *See Trustees of Ind. Univ. v. Town of Rhine*, 170 Wis. 2d 293, 298–299, 488 N.W.2d 128, 130 (Ct. App. 1992) ("Statutory construction is a question of law. Likewise, the application of a statute to an undisputed set of facts presents a question of law.") (citation omitted). In deciding this case, we must heed the legislature's declaration: "Exemptions under this chapter shall be strictly construed in every instance with a presumption that the property in question is taxable, and the burden of proof is on the person who claims the exemption." WIS. STAT. § 70.109.

> Taxation is the rule and exemption from taxation is the exception. Tax exemption statutes are matters of legislative grace and are to be strictly construed against the granting of an exemption. A strict construction does not mean the narrowest possible reading, however. Rather, the statute should be construed in a "strict but reasonable" manner. The party claiming the exemption must show the property is clearly within the terms of the exception and any doubts are resolved in favor of taxability.

*Trustees of Ind. Univ.*, 170 Wis. 2d at 299, 488 N.W.2d at 130 (citations omitted). We now turn to the appeal and cross-appeal.

A. *Appeal by the City of Wauwatosa.*

1. *Introduction.*

¶ 17. As material here, WIS. STAT. § 70.11(2) declares that "[p]roperty owned by any county" "is ex-

empted from general property taxes."[5] Section 70.11(2) also provides: "Leasing the property exempt under

[5] As material to this part of the opinion, WIS. STAT. § 70.11(2) reads in full:

**Property exempted from taxation.** The property described in this section is exempted from general property taxes if the property is exempt under sub. (1), (2), (18), (21), (27) or (30); if it was exempt for the previous year and its use, occupancy or ownership did not change in a way that makes it taxable; if the property was taxable for the previous year, the use, occupancy or ownership of the property changed in a way that makes it exempt and its owner, on or before March 1, files with the assessor of the taxation district where the property is located a form that the department of revenue prescribes or if the property did not exist in the previous year and its owner, on or before March 1, files with the assessor of the taxation district where the property is located a form that the department of revenue prescribes. Leasing a part of the property described in this section does not render it taxable if the lessor uses all of the leasehold income for maintenance of the leased property or construction debt retirement of the leased property, or both, and, except for residential housing, if the lessee would be exempt from taxation under this chapter if it owned the property. Any lessor who claims that leased property is exempt from taxation under this chapter shall, upon request by the tax assessor, provide records relating to the lessor's use of the income from the leased property. Property exempted from general property taxes is:

. . . .

(2) MUNICIPAL PROPERTY AND PROPERTY OF CERTAIN DISTRICTS, EXCEPTION. Property owned by any county, city, village, town, school district, technical college district, public inland lake protection and rehabilitation district, metropolitan sewerage district, municipal water district created under s. 198.22, joint local water authority created under s. 66.0823, family care district under s. 46.2895 or town sanitary district; lands belonging to cities of any other state used for public parks; land tax-deeded to any county or city before January 2; but any residence located upon property owned by the county for park purposes that is rented out by the county for a nonpark purpose shall not be exempt from taxation. Except as to land acquired under s. 59.84 (2) (d), this exemption shall not apply to land conveyed after August 17, 1961, to any such governmental unit or for its benefit while the grantor or others for his or her

222

this subsection, regardless of the lessee and the use of the leasehold income, does not render that property taxable." The initial inquiry is whether the property is "owned" by the tax-exempt entity even though the tax-exempt entity has transferred some of its interests in that property to someone else. *See City of Franklin v. Crystal Ridge, Inc.*, 180 Wis. 2d 561, 567–568, 509 N.W.2d 730, 732–733 (1994) (taxation of buildings on land). If, following the transfer of those interests, the governmental entity is still the "owner" under § 70.11(2), then leasing the property does not make the property taxable; if, however, the governmental entity transfers sufficient interests in the property so the governmental entity is no longer the "owner" under § 70.11(2), the property is taxable for so long as the transferee retains those interests. *Crystal Ridge*, 180 Wis. 2d at 567–568, 509 N.W.2d at 732–733.

¶ 18. There are three decisions that set the rules for our analysis: *Mitchell Aero, Inc. v. City of Milwaukee*, 42 Wis. 2d 656, 168 N.W.2d 183 (1969); *Gebhardt v. City of West Allis*, 89 Wis. 2d 103, 278 N.W.2d 465 (1979); and *Crystal Ridge*. We discuss these decisions in turn, and then apply the facts of this case to their teachings.

2. *The Governing Case Law.*

a. *Mitchell Aero.*

¶ 19. Although not the first decision to deal with what is "ownership" under the tax-exemption statutes, *Mitchell Aero* put into play the rule that "legal title" was

benefit are permitted to occupy the land or part thereof in consideration for the conveyance. Leasing the property exempt under this subsection, regardless of the lessee and the use of the leasehold income, does not render that property taxable.

not necessarily determinative as to whether property could be taxed. *Id.*, 42 Wis. 2d at 659–662, 168 N.W.2d at 184–186.

> We think the ownership of property by a municipality to qualify for exemption under s. 70.11(2), Stats., means real or true ownership and not paper title only. Ownership is often referred to in legal philosophy as a bundle of sticks or rights and one or more of the sticks may be separated from the bundle and the bundle will still be considered ownership. What combination of rights less than the whole bundle will constitute ownership is a question which must be determined in each case in the context of the purpose of the determination. In this case for exemption one needs more than the title stick to constitute ownership.

*Id.*, 42 Wis. 2d at 662, 168 N.W.2d at 185–186.

¶ 20. In *Mitchell Aero*, Mitchell Aero had a "noncommercial aviation business" at what was then known as "General Mitchell Field." *Id.*, 42 Wis. 2d at 658, 168 N.W.2d at 183. Mitchell Aero leased land from Milwaukee County for twenty years, with an option to renew for five more years. *Id.*, 42 Wis. 2d at 663, 168 N.W.2d at 186. Mitchell Aero built two hangars on the land at its own expense. *Id.*, 42 Wis. 2d at 658, 168 N.W.2d at 183. Title to the hangars, however, was transferred to Milwaukee County for no consideration other than the County's permission to build the hangars. *Id.*, 42 Wis. 2d at 658, 663, 168 N.W.2d at 183, 186. Although *Mitchell Aero* concluded that it did not "view this arrangement as a bona fide conveyance of the buildings, the cost of which is to be treated as prepaid rent," *id.*, 42 Wis. 2d at 665, 168 N.W.2d at 187, Mitchell Aero was not obligated to pay rent for either hangar for the initial twenty-year term, but would have to pay rent for one of the hangars during the five-year renewal period, *id.*, 42 Wis. 2d at 663, 168 N.W.2d at 186.

¶ 21. Under its lease with the County, Mitchell Aero could make "alterations" to one of the hangars with the County's consent, and those alterations would become, like the hangars, Milwaukee County property. *Ibid.* Further, under its land-lease with Milwaukee County, Mitchell Aero had to insure that hangar against fire, and if it collected on the policy Mitchell Aero had to use the money for the "immediate repair of any damage to the hangar." *Id.*, 42 Wis. 2d at 663–664, 168 N.W.2d at 186. *Mitchell Aero* assumed that because insurance could not exceed the insured's insurable interest in property, Mitchell Aero had "a substantial insurable interest in the hangars since it was required to insure up to 80 percent of the insurable value." *Id.*, 42 Wis. 2d at 664, 168 N.W.2d at 186.[6] If the County either condemned Mitchell Aero's leasehold interest in the land before the end of the lease term, or abandoned the airport as "an air terminal," or if the County breached a lease provision so as to "terminate" the lease, Mitchell Aero was entitled to payment of its "unamortized investment" in the hangars, less a five-percent reduction for each year Mitchell Aero was able to use the hangars. *Ibid.* ("This provision of the lease assures to the lessee under these conditions its investment cost of the hangars on an amortized basis if it does not enjoy the possession and use of the buildings for the full term of the lease.").

---

[6] *Mitchell Aero, Inc. v. City of Milwaukee*, 42 Wis. 2d 656, 168 N.W.2d 183 (1969), refers to insurance on one hangar, and then without explanation assumes that both hangars had to be insured by Mitchell Aero "up to 80 percent of the insurable value." *Id.*, 42 Wis. 2d at 663–664, 168 N.W.2d at 186. Resolution of this puzzling aspect of *Mitchell Aero*, however, is not necessary for our analysis.

¶ 22. *Mitchell Aero* determined that although under Mitchell Aero's lease with the County "some of the rights usually associated with ownership are in Aero and others in the county," Mitchell Aero's "arrangement" with Milwaukee County did "not pass sufficient incidents of ownership [of the hangars] with the paper title [to the hangars] to constitute the county as the true owner of the hangars within the meaning of 'owned' in s. 70.11(2), Stats." *Mitchell Aero,* 42 Wis. 2d at 665, 168 N.W.2d at 187. Stated another way, the County's "control" over, and title-ownership in, the hangars did not override Mitchell Aero's ability to use the hangars in its business to the exclusion of the County for the lease term, but rather "concern[ed] the operation of the airport" and was thus "not indicative of true ownership" of the hangars by the County to make them exempt from taxation. *Ibid.*

b. *Gebhardt.*

¶ 23. *Gebhardt,* like *Mitchell Aero,* concerned a municipality's attempt to tax buildings built on land leased from a tax-exempt entity. Richard Gebhardt and his partner built an ice-skating facility on land they leased from the State of Wisconsin in the Wisconsin State Fair Park in West Allis. *Gebhardt,* 89 Wis. 2d at 104, 278 N.W.2d at 465. The lease was for an initial term of ten years, which Gebhardt and his partner could renew for ten more years. *Ibid.* Gebhardt and his partner spent "nearly $500,000" building the ice-rink facility. *Ibid.* West Allis sought to tax the facility. *Id.,* 89 Wis. 2d at 104, 278 N.W.2d at 466. *Gebhardt* concluded that although Gebhardt and his partner retained title to the facility for the lease term, the State was the facility's beneficial owner, and the facility was thus exempt from taxation. *Id.,* 89 Wis. 2d at 106–115, 278

N.W.2d at 466–471. *Gebhardt's* analysis focused on two main areas: receipt of benefit from the building, and control over the building's construction and use. We look at these aspects of the decision in turn.

¶ 24. As counsel for Wauwatosa expressed it at oral argument, operation of the ice-rink building at State Fair Park was, in essence, a joint venture between the State and Gebhardt and his partner, with the State receiving substantial benefits from that joint undertaking. Under the lease, Gebhardt and his partner could use the rink for ten months out of the year, and the State had exclusive use of the facility for the remaining two months. *Id.*, 89 Wis. 2d at 109, 111, 278 N.W.2d at 468, 469. The State also had the exclusive right to sell concession-type items and refreshments in the ice-rink facility. *Id.*, 89 Wis. 2d at 111, 278 N.W.2d at 469. Additionally, the State not only received rent from Gebhardt and his partner, but also was paid "a percentage of the gross receipts from the operation" of their ice-rink business. *Id.*, 89 Wis. 2d at 110, 278 N.W.2d at 468. The State's benefit was substantial: "In 1975, [Gebhardt and his partner]'s income from the property was $81,000 for the ten-month period; while the state received $62,695 in rental proceeds during the two-month period it enjoyed exclusive use of the building and netted $4,896 in profit from operating the concession stand throughout the year." *Id.*, 89 Wis. 2d at 115, 278 N.W.2d at 471. Moreover, the State was able to make Gebhardt and his partner pay $15,000 to modify the building to better accommodate the State's needs during the two months it had exclusive use of the building. *Id.*, 89 Wis. 2d at 111, 278 N.W.2d at 469. Further, the State got "a full and complete possessory interest in the" building once the lease expired, *id.*, 89 Wis. 2d at 115, 278 N.W.2d at 470, and the obligations

by Gebhardt and his partner to keep the building maintained, insured and to bear the risk of loss protected the State's ripening "possessory interest" as the lease-term ticked away, *id.*, 89 Wis. 2d at 109, 278 N.W.2d at 468.

¶ 25. As we have seen, the State had significant control over the design, construction, and use of the ice-rink facility, most of which concerned the State's ability to profit from the ice-rink building. *Id.*, 89 Wis. 2d at 110–112, 278 N.W.2d at 468–469. But there were other aspects of State control over the operation run by Gebhardt and his partner as well: The State had keys to the ice-rink facility and free access, *id.*, 89 Wis. 2d at 111, 278 N.W.2d at 469; under the lease, Gebhardt and his partner had "to specifically post their hours and fees and cater to special groups in the neighborhood," *id.*, 89 Wis. 2d at 112, 278 N.W.2d at 469; ice-rink customers could not "enter the Fair Park when the state is sponsoring a special event such as automobile races, snowmobile races or concerts," *ibid.*; and Gebhardt and his partner could not sell, convey, lease, or sublet the ice-rink building unless the State gave its prior written consent, *ibid.*

c. *Crystal Ridge.*

¶ 26. *Crystal Ridge*, like the other two cases, concerned a municipality's attempt to tax buildings on land leased by a tax-exempt entity. *Id.*, 180 Wis. 2d at 563–564, 509 N.W.2d at 730–731. If *Gebhardt* was a joint venture in essence, *Crystal Ridge* was a joint venture in fact.

> The county originally planned to develop a ski hill and recreational facility on a 100 acre parcel of land located in the cities of Franklin and Greendale. However,

228

objections from the Wisconsin Department of Natural Resources prevented the county from carrying out its plan.

Midwest [Development Corp.] proposed construction of a ski hill, ski chalet and other improvements on the same land at no cost to taxpayers. The county accepted this proposal and embarked on a joint venture with Midwest to develop, construct and operate "a down hill facility with restaurant/chalet and parking lot and other sports activities for all seasons . . . ."

*Id.*, 180 Wis. 2d at 564, 509 N.W.2d at 731 (ellipses in original). The joint venture was to be on county land, under an initial ten-year lease, with three five-year-extension options. *Ibid.* Although "Crystal Ridge physically occupie[d] and manage[d] the ski hill," Midwest was "the sole lessee and legal occupant" of the property. *Id.*, 180 Wis. 2d at 565 n.3, 509 N.W.2d at 732 n.3. The lease required that Midwest build and pay for a "75 foot high ski hill along with buildings and other improvements to the land costing 'in excess of $500,000.' " *Id.*, 180 Wis. 2d at 565, 509 N.W.2d at 731. Under the lease, Midwest had to pay Milwaukee County "the greater of three percent of gross profits or $10,000 per year." *Ibid.* The County controlled where the ski hill was to be built and its slope. *Ibid.* The lease also required that the County "approve the design, specifications, construction and placement of all buildings and other improvements" consistent with schedules approved by the County. *Ibid.* Fees paid to Midwest to dump landfill on the site, from which the ski hill was to be fashioned, were split between Midwest and the County, with Midwest required to use its share of the fees to " 'improve the facility.' " *Ibid.* Further, the County had significant control over not only Midwest's accounting, record-keeping, and cash-management equipment, but

also the ski hill's "hours of operation," prices charged for ski-hill lift tickets, ski rentals, and food and concessions sold at the facility, as well as even "some control over the restaurant menu." *Id.*, 180 Wis. 2d at 565–566, 509 N.W.2d at 732.

¶ 27. Midwest had to insure the facility against potential liability, with the County as a named insured. *Id.*, 180 Wis. 2d at 566, 509 N.W.2d at 732. Midwest also had to get fire insurance, although the County was not a named insured under this policy. *Ibid. Crystal Ridge* also mentioned that Midwest's bank did not regard the ski-hill facility as Midwest's property and "has refused to consider these buildings as mortgageable property or as collateral for loans." *Id.*, 180 Wis. 2d at 567, 509 N.W.2d at 732.

¶ 28. After reviewing the lease and the relationships between Midwest and Milwaukee County in connection with the ski-hill facility, and "balancing the county's indicia of ownership against Midwest's indicia of ownership," *Crystal Ridge* determined that Milwaukee County was "the beneficial owner of the" facility and that, accordingly, the property was "exempt from the general property tax pursuant to sec. 70.11(2), Stats." *Crystal Ridge*, 180 Wis. 2d at 571, 509 N.W.2d at 734.

¶ 29. The rule we derive from *Mitchell Aero, Gebhardt,* and *Crystal Ridge,* which all concerned buildings put on land leased from a tax-exempt entity, is that the tax-exempt entity is the beneficial owner of the property if it: (1) gets not-inconsequential benefits from the property, and (2) has substantial control focused on preserving or enhancing those benefits. Where both aspects are present, as they are in *Gebhardt* and *Crystal Ridge,* the property is exempt from taxa-

230

tion.[7] Where, on the other hand, the benefit to the tax-exempt entity is more illusory than real, or where the control only advances the tax-exempt entity's institutional interest as distinct from enhancing or preserving the benefits from the lease, the property will not be exempt from taxation, as in *Mitchell Aero*, where although the County received title to the hangars that *Mitchell Aero* built, it got no benefit from Mitchell Aero's use of the hangars during the initial term of the lease (it got no rent and could not use the hangars), *id.*, 42 Wis. 2d at 663, 168 N.W.2d at 186, and the control it exercised advanced only the County's institutional interests in connection with the overall running of the airport, rather than any direct benefit it got from the hangers during the lease term, *see id.*, 42 Wis. 2d at 665, 168 N.W.2d at 187.

### 3. *Regional Medical Center's Daycare Facility.*

■

¶ 30. As we have seen, unlike *Mitchell Aero, Gebhardt*, and *Crystal Ridge*, which all involved a determination of whether the tax-exempt-entity lessor of land was the beneficial owner of structures built on that land by the lessee, this case involves both the County land and the building that the Regional Medical Center put on that land. Neither party asks that we consider the beneficial-ownership issue except as it pertains to both the land and the building as a unit.

¶ 31. As Wauwatosa argues, a significant indicium of "beneficial ownership" is receipt of a benefit. Unlike the situations in both *Gebhardt* and *Crystal*

---

[7] We express no opinion on what would happen if only one aspect were satisfied because, as we discuss below, neither aspect is present here.

*Ridge*, where the tax-exempt entity got substantial financial benefits from what were essentially joint ventures with the businesses to which the tax-exempt entities leased their land, for the first thirty years of its lease with the Regional Medical Center, Milwaukee County not only gets no financial benefit from the arrangement but also has lost the use of, and the potential income stream from, the one and three-quarters acres it leased to the Center at an annual rental of one dollar. Although during the last twenty years of the lease the County will be able to charge the Center a rental based on the land's fair-market value, this partial and future recoupment of an income stream is not a significant present benefit from the land to make it the beneficial owner of the land *now* so as to make the land and the building on that land tax exempt for the years for which the Center seeks a refund of the taxes it paid under protest. Similarly, that the County can, if it wishes, have title to the Center's daycare building after the lease either expires or is terminated is also not a sufficient benefit *now* so as to make the County the building's beneficial owner for the tax years underlying this appeal. Further, unlike the situation in *Crystal Ridge*, where the lessee could not, apparently, mortgage its leasehold interest, *id.*, 180 Wis. 2d at 567, 509 N.W.2d at 732 (lessee's bank "refused to consider these buildings as mortgageable property or as collateral for loans"), the County's arrangement with the Regional Medical Center specifically permits the Center to do precisely that, thereby adding a significant entry on the beneficial-ownership side of the Center's bundle-of-ownership-rights ledger.

¶ 32. As for aspects of control by Milwaukee County over the daycare facility, none of them gives to the County the type of day-to-day oversight that was

the hallmark of control in both *Gebhardt* and *Crystal Ridge*. Rather, they are mostly generic safety, health, and aesthetic requirements that serve the County's institutional interests because the daycare facility is on the County Institutions Grounds. *See Mitchell Aero*, 42 Wis. 2d at 665, 168 N.W.2d at 187 ("Such control the county keeps over these hangars is not indicative of true ownership but concerns the operation of the airport."). Similarly, the insurance requirements serve the dual function of protecting the Center and its property, and, also, the County from either having a damaged building on the County Institutions Grounds that the County would have to repair, replace, or raze with its own funds, or, with respect to the liability insurance, run the risk of potential liability for activities on the daycare property over which the County has no day-to-day control. These, too, are institutional concerns not designed to enhance any current financial benefit the County receives from the lease arrangement with the Center. *See ibid.* As such, they do not make the County the "beneficial owner" of the property (land and building) for the tax years underlying this appeal.

B. *Cross-Appeal by the Milwaukee Regional Medical Center.*

■

¶ 33. As an alternative argument, the Regional Medical Center contends that if it is deemed to be the "owner" of the daycare property (land and building) for the tax years underlying this appeal, it is exempt from taxation under Wis. Stat. § 70.11(4), which, as material here, declares non-taxable "[p]roperty owned and used exclusively by educational institutions offering regular courses 6 months in the year; or by educational associations." The Center does not claim that it is an

"educational institution," but rests on its claim that it is an "educational association."

¶ 34. The statute does not define "educational association." *Janesville Cmty. Day Care Ctr., Inc. v. Spoden*, 126 Wis. 2d 231, 234 n.2, 376 N.W.2d 78, 80 n.2 (Ct. App. 1985). The case law, however, is clear: the association must pass two hurdles. First, "an organization must be a nonprofit organization substantially and primarily devoted to educational purposes. If the educational function is merely incidental to nonexempt activities . . . an exemption will not be granted." *Trustees of Ind. Univ.*, 170 Wis. 2d at 302, 488 N.W.2d at 131 (citation omitted). Second, "the organization must be devoted to 'traditional' educational activities." *Ibid.* (quoted source omitted). Although the Regional Medical Center's daycare facility involves " 'traditional' educational activities," and the Center is a "nonprofit organization," the Record demonstrates unequivocally that the Regional Medical Center is not "substantially and primarily devoted to educational purposes."

¶ 35. The parties' stipulation describes the Regional Medical Center's purposes as set out in the Center's bylaws: " '(1) to aid and support the development and provision of health services in the Milwaukee region by assisting its members to develop and operate, high-quality, efficient and effective programs of education, research and patient care; (2) to facilitate the efficient development and functioning of the Medical Center Campus.' " Additionally, a financing prospectus for bonds issued on behalf of the Regional Medical Center recites: "The primary business activities of the [Regional Medical Center] include the operation of the 'Flight for Life' air ambulance service, the operation of a child care center and the ownership of a warehouse

234

facility leased to certain Members." According to the Regional Medical Center's financial statements in the Record, the Center received more than five million dollars in "transport revenues" for each of the years 2000 and 2001, more than six million dollars for 2002, and some seven million dollars for 2003. Child-care fees were $767,663 for 2000, $1,051,015 for 2001, $1,218,943 for 2002, and $1,374,780 for 2003. Further, although, as set out in its bylaws, "assisting its *members* to develop and operate, high-quality, efficient and effective programs of education," may facilitate and advance a member's "educational association" activities, it does not make the Regional Medical Center, which is a coordinating body for its constituent members, an "educational association." (Emphasis added.)

¶ 36. The Regional Medical Center has not satisfied its burden to prove that its daycare facility "is clearly within the terms of the exception," *see Trustees of Ind. Univ.*, 170 Wis. 2d at 299, 488 N.W.2d at 130, which requires that an "educational association" for the purposes of Wis. Stat. § 70.11(4) be an "organization *substantially and primarily* devoted to educational purposes," *see Trustees of Ind. Univ.*, 170 Wis. 2d at 302, 488 N.W.2d at 131 (emphasis added). As Wauwatosa reflects in its brief, "[i]t cannot credibly be argued that [the Regional Medical Center]'s *primary* purpose is to educate pre-school children." (Emphasis in original.) Indeed, at oral argument, counsel for the Center was asked whether the daycare facility was the "dog or the tail." She replied that it would be more accurate to say that it was a "leg."

## III.

¶ 37. The Regional Medical Center has not shown that its daycare facility was, for the years at issue on

235

this appeal, 2001, 2002, and 2003, exempt from taxation by Wauwatosa. Accordingly, we reverse.

*By the Court.*—Order reversed.

¶ 38. WEDEMEYER, P.J. (*concurring in part; dissenting in part*). I write separately because I would affirm the trial court's order on both the beneficial owner issue and the educational association issue.

## A. *Beneficial Owner Issue.*

¶ 39. The majority concludes that the Milwaukee Regional Medical Center, rather than Milwaukee County, is the beneficial owner of the day care facility involved here, and therefore does not qualify for property tax exemption under WIS. STAT. § 70.11(2). Although the issue of beneficial ownership is, in my view, a close question, I would affirm the trial court's determination that the County maintained ownership of the property.[1]

¶ 40. The question of whether the County, as lessor, maintained "beneficial ownership" of the property at issue here, or whether beneficial ownership became vested in the Milwaukee Regional Medical Center, as lessee, is reviewed on a case-by-case basis. *See Mitchell Aero, Inc. v. City of Milwaukee*, 42 Wis. 2d at 662; *Gebhardt*, 89 Wis. 2d at 109–10; *Crystal Ridge, Inc.*, 180 Wis. 2d at 568. The fact-specific analysis is based on an examination of all factors relating to

---

[1] It is undisputed that the County owns legal title to the property. The issue in this case is whether by leasing the property to the Milwaukee Regional Medical Center, the latter became the beneficial owner, and therefore rendered the property subject to taxation.

ownership. The key question is whether the tax-exempt entity, here the County, maintained significant control over the property.

¶ 41. The trial court, here, addressed the factors that favored concluding that the County was the beneficial owner:

> Under the test or factors that would weigh in favor of County ownership, I think the following list, perhaps not exhaustive, but: [1] MRMC is required to obtain County approval of construction plans, [2] the lease would terminate and lessor would have right of possession if all construction was not completed in time. [3] The use of the property is limited to running a day care.
>
> [4] I think it is important that this facility also, I think from, at least without having gone out there and looked at it, but my sense is that it has more possible alternative uses than some of the other buildings.
>
> [5] The lessor has the right to enter the premises. [6] The lessee cannot sell, convey or sublet without written permission from the County. [7] The lessor [i]s required to be included as an additional insured. [8] The lessor is required to restore complete possessory interest upon termination of the lease. [9] The lessee can remove personal property on termination of the lease. However, is required to indemnify for any damages.
>
> [10] The County is not required to purchase back the property from the MRMC. [11] MRMC is required to obtain consent before constructing a parking lot. [12] They are required to pay the County for exterior security. [13] MRMC is required to obtain fire insurance equal to 80 percent of value naming the County as co-insured. [14] They are required to obtain liability insurance naming [the] County as additional insured. [15] They have to get permission before making substantial improvements during the last ten years of the

lease. [16] They are required to keep the day care in good state of clean condition, [17] plus service at least 140 children. [18] They have to purchase their electricity and water from the County and [19] any additional or alterations to the facility costing over $150,000 require consent of the County. Many of those things I read are similar to the various conditions set forth in the *Gebhardt* and *Crystal Ridge* decisions.

Next, the trial court addressed the factors which suggested that the Milwaukee Regional Medical Center was the beneficial owner:

On the list showing, or tending to show MRMC ownership, [1] MRMC can mortgage their leasehold interests, [2] they are responsible for preparing construction site and building property. [3] They only pay a dollar's rent for first 30 years. [4] They do not pay the County any revenues from the activities on the property. [5] They have title to the facility and any fixtures, equipment or other property upon the premises. [6] The County does not reserve any right for its use of the property for its own purposes. [7] They have – the length of the lease is 50 years. [8] They have no involvement in the operation of the day care. [9] County does not set the prices or hours of operation, and [10] County's approval with respect to any alterations cannot be unreasonably withheld.

After balancing the factors favoring County ownership versus Milwaukee Regional Medical Center ownership, the trial court determined:

I believe that the County does have significant control over the property as set forth in the *Gebhardt* and *Crystal Ridge* cases.

They have to, MRMC has to gain permission from the County before it engages in many activities related to their leasehold interest, such as subleasing, building

any additions, constructing a parking lot, etc. and while the County cannot unreasonably withhold consent, they still have and retain the right to say no if they don't agree with some change in use of the property that they, MRMC wants to engage in and therefore, comparing the cases, I think that the County exercises enough control . . . . They are the owners.

So, I'm finding that based on this record, that the County is the beneficial owner of the property. I find comparisons in this case much closer to *Gebhardt* and *Crystal Ridge* than *Mitchell Aero*.

¶ 42. I agree with the trial court's assessment. These tax exemption cases require a balancing of factors. The reason these cases must be assessed on a case-by-case basis is because there is no bright-line rule. All cases will have factors leaning both ways. Here, the trial court, after assessing all of the factors, concluded that the circumstances in the instant case are closer to the rulings that the County maintained beneficial ownership and therefore the day care property should be exempt from paying taxes to the City of Wauwatosa. I agree with the trial court's assessment. In balancing all the "owner-ship" factors here, and applying the three pertinent cases, the scale tips in favor of the County maintaining beneficial ownership. Therefore, WIS. STAT. § 70.11(2), which grants tax exemption to all County-owned prop-erty applies, and the day care center is exempt from general property taxes for the tax years in question.

¶ 43. Moreover, I reject the City's contention that the trial court erred because it simply listed the factors without actually balancing the weight of each factor. The case law in this area does not require a balancing of the weight of each individual factor. Rather, the cases dictate a listing of all the indicia demonstrating owner-ship by the County and a listing of all the indicia

demonstrating ownership by the Milwaukee Regional Medical Center. Once the indicia have been identified, the trial court's balancing involves determining whether the indicia results in the County maintaining sufficient control so as to justify tax exemption. This is exactly what the trial court did in this case. It concluded, based on the indicia, that the County executed a lease, which retained sufficient control over the property for purposes of tax exemption.

¶ 44. I also respectfully disagree with the majority's conclusion that the County does not receive a sufficiently significant financial benefit to retain beneficial ownership. In reviewing *Mitchell Aero*, *Gebhardt*, and *Crystal Ridge*, I am not convinced that those cases require proof of an immediate financial benefit in order to find that the County retained beneficial ownership. Rather, my review of those cases suggests that financial benefit was one among many "indicia" of ownership to be considered. These cases present a difficult determination because no two cases involve the same ownership indicia. Thus, we look at all the factors to determine whether the tax-exempt status should apply.

¶ 45. Here, in addition to the control the County retained, the County also receives a not-insignificant financial benefit. Milwaukee Regional Medical Center is required to purchase its electricity, water, sewer and security from the County. It is required to maintain hazard and liability insurance, naming the County as a co-insured and/or an additional insured. The Milwaukee Regional Medical Center agreed to share in the County's legal obligation for payment of fire protection services.[2] These are significant financial benefits to the

---

[2] Before the lease was executed, the County agreed to pay to the City of Wauwatosa 85% of the construction costs for a new

240

County. In addition, there is a public benefit which inures to County residents by having the day care facility located on the County grounds. In addition, the County receives the financial benefit of future rent and the deferred capital value of the building.[3] When the lease expires, the leasehold returns to the County without requiring the County to pay any money to the former tenant. Thus, in my opinion, the County retains a sufficiently significant financial benefit to maintain beneficial ownership. As our supreme court pointed out in *Gebhardt*: "We note that public policy favors this type of tax-exempt treatment for conveyance-leaseback arrangements between private enterprise and governmental bodies." *Id.*, 89 Wis. 2d at 115.

¶ 46. Although the facts in this conveyance-leaseback arrangement are slightly different than all three of the cases discussed herein, I agree with the trial court that that indicia of ownership tips in favor of the County retaining beneficial ownership and, therefore, the property should be tax exempt.

---

fire station (up to a maximum of $800,000), and be responsible for approximately 74% of the cost for the fifteen additional firefighter positions resulting from the construction. Pursuant to the lease with the County, the Milwaukee Regional Medical Center agreed to pay a *pro rata* share of those costs, thereby relieving the County of a portion of its obligation under its agreement with the City of Wauwatosa. The financial benefit to the County of this provision during the years at issue here was $6645.30.

[3] Beginning in year 31 of the lease, the Milwaukee Regional Medical Center will pay fair market value rent to the County, which is estimated to be approximately $5900 annually. At the conclusion of the leasehold, the County will receive, free of any encumbrances, the day care facility, which was constructed at a cost of at least $400,000.

241

*B. Educational Association Issue.*

¶ 47. The trial court ruled that WIS. STAT. § 70.11(4) did not apply to this case because the Milwaukee Regional Medical Center does not qualify as an educational association. The majority opinion agrees with the trial court's ruling on this issue. I concur in that part of the majority's opinion.

¶ 48. Based on the foregoing, I respectfully concur in part and dissent in part with the majority opinion in this case. I would affirm *in toto* the trial court's order.